Michael J. HARRINGTON, Appellant,

v.

George BUSH, as Director of the Central Intelligence Agency, et al.

No. 75–1862.

United States Court of Appeals, District of Columbia Circuit.

Argued 15 Sept. 1976.

Decided 18 Feb. 1977.

Rehearing Denied 15 April 1977.

Michael Krinsky, New York City, with whom Eric Lieberman, New York City, and David Rein, Washington, D.C., were on the brief, for appellant.

John K. Villa, Atty., Dept. of Justice, Washington, D.C., for appellees. Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U.S. Atty., Leonard Schaitman, and Thomas S. Moore, Attys., Dept. of Justice, Washington, D.C., were on the brief for appellees.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

■ Appellant, a Member of the United States House of Representatives,[1] filed suit in the District Court seeking both a declaration that certain foreign and domestic activities of the Central Intelligence Agency (hereinafter the Agency or the CIA) are illegal and also an injunction prohibiting the Agency from using the funding and reporting provisions of the Central Intelligence Agency Act of 1949 [2] (hereinafter the Act) in connection with the allegedly illegal activities.[3] On a motion by the defendants,

---

1. Rep. Harrington represents the Sixth Congressional District of Massachusetts in the House of Representatives. Complaint, ¶ 3, Joint Appendix (J.A.) at 4a.

2. 50 U.S.C. § 403a *et seq.* (1970).

3. The defendants in this suit are those officials with statutory authority over the Agency. These include the Director of the Agency and the National Security Advisor to the President. At the time this action was instituted the National Security Advisor was Henry Kissinger, who also served as Chairman of the Intelligence Committee of the National Security

the District Court (Pratt, J.) dismissed the complaint on the grounds that the appellant lacked standing to bring the action and that the issues presented were nonjusticiable political questions.[4] We affirm the order of the District Court on the grounds that the appellant lacks standing in his capacity as a Congressman[5] to maintain this action.[6]

## I. THE CHALLENGED STATUTORY FRAMEWORK

 The funding and reporting provisions of the CIA Act, which are the object of appellant's challenge in this case, represent an exception to the general method for appropriating and reporting the expenditure of federal funds. Article I, section 9, clause 7 of the U.S. Constitution provides that

> No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

This clause is not self-defining and Congress has plenary power to give meaning to the provision.[7] The Congressionally chosen

---

Council and Chairman of the 40 Committee. The Agency is under the direction and control of the National Security Council, 50 U.S.C. §§ 403(a) and (d), and the 40 Committee, which is composed of high-ranking government officials, is under the direction of the National Security Advisor. In addition, since the suit involves the appropriation and accounting of public funds, the Secretary of the Treasury is included as a defendant. The three defendants are sued in their official capacities.

**4.** In denying standing to the appellant the District Court relied on two decisions of this court rendered without opinion, *Stokes v. General Services Administration* (D.C.Cir. No. 74–1886, 9 June 1975) and *Public Citizen, Inc. v. Sampson* (D.C.Cir. No. 74–1619, 16 June 1975), reported at 515 F.2d 1018 (1975), and contrasted its decision in this case with two opinions of this court which found standing for members of Congress, *Kennedy v. Sampson,* 167 U.S. App.D.C. 192, 511 F.2d 430 (1974), and *Mitchell v. Laird,* 159 U.S.App.D.C. 344, 488 F.2d 611 (1973).

This is the appropriate place to clear up any confusion concerning the status of this court's opinion in *Mitchell v. Laird.* The *Mitchell* opinion had been published in an advance sheet at 476 F.2d 533. The opinion does not appear in the bound volume of the same number; the table of cases in that volume indicates that the *Mitchell* case was "Withdrawn by Order of Court." The opinion was withdrawn from Volume 476 in order to include supplementary material relating to the request for a rehearing *en banc.* The *original Mitchell* opinion, along with the supplemental material, appears at 159 U.S.App.D.C. 344, 488 F.2d 611 (1973). The withdrawal of the opinion therefore does not affect either the language or the precedential effect of the *Mitchell* opinion.

**5.** In his complaint the appellant also alleges standing to sue as a citizen and a taxpayer. Complaint, ¶ 3, J.A. at 4a. The allegations of citizen and taxpayer standing are not pursued

in this appeal and we therefore do not reach these issues. *See* Appellant's Brief at 4 n. 2.

**6.** The standing and political question doctrines are both facets of the broader concept of justiciability and ". . . either the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the complaining party." *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 215, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706 (1974). In the *Reservists* case the Supreme Court recognized that there is no fixed rule as to the proper sequence of analysis when more than one facet of the justiciability concept is at issue, *id.* n. 5, a point we discuss more fully under III.B., *infra,* at nn. 75–82. The Court did state that, when the issues of standing and political question are presented together, the determination as to whether a political question exists is "[t]he more sensitive and complex task," *id.* at 215, 94 S.Ct. at 2929. In this case we rest our decision on the denial of standing and do not reach the political question issue. For a different approach under similar circumstances, *see Holtzman v. Schlesinger,* 484 F.2d 1307 (2d Cir. 1973).

**7.** With respect to the appropriations process, *see, e. g., Hart's Case,* 16 Ct.Cl. 459, 484 (1880), aff'd, 118 U.S. 62, 6 S.Ct. 961, 30 L.Ed. 96 (1886) ("The absolute control of the moneys of the United States is in Congress, and Congress is responsible for its exercise of this great power only to the people.")

With respect to the "regular Statement and Account" phrase of the clause, the Supreme Court has recently recognized that "Congress has plenary power to exact any reporting and accounting it considers appropriate in the public interest," *United States v. Richardson,* 418 U.S. 166, 178 n. 11, 94 S.Ct. 2940, 2947, 41 L.Ed.2d 678 (1974). Appellant accepts the notion that Congressional power is plenary in this area and that his rights to information concern-

method of implementing the requirements of Article I, section 9, clause 7 is to be found in various statutory provisions. With respect to the appropriations process, the relevant laws of general application are found at 31 U.S.C. §§ 11, 628, and 696. The President is required by section 11 to present a detailed annual budget to Congress which itemizes proposed expenditures for each agency or department. Section 628 provides that appropriated funds "shall be applied solely to the objects for which they are respectively made, and for no others."[8] Section 696 prevents the transfer of funds appropriated to one agency or instrumentality to another agency or instrumentality without express congressional approval.[9]

■ With respect to the reporting of expenditures, the key statutory provision of general application is 31 U.S.C. § 1029 which imposes a duty on the Secretary of the Treasury to provide Congress on an annual basis with ". . . an accurate, combined statement of the receipts and expenditures . . . of all public moneys. . . ."[10] Since Congressional power is plenary with respect to the definition of the appropriations process and reporting requirements, the legislature is free to establish exceptions to this general framework, as has been done with respect to the CIA.

By virtue of section 403f(a) of the CIA Act, the Agency is authorized to

> Transfer to and receive from other Government agencies such sums as may be approved by the Bureau of the Budget, for the performance of any of the functions or activities authorized under

sections 403 and 405 of this title, and any other Government agency is authorized to transfer or receive from the Agency such sums without regard to any provisions of law limiting or prohibiting transfers between appropriations. Sums transferred to the Agency in accordance with this paragraph may be expended for the purposes and under the authority of sections 403a–403j of this title without regard to limitations of appropriations from which transferred. . . .[11]

Thus, the funds used to operate the CIA do not derive from a specific appropriation voted by the Congress. Rather, these funds are concealed within the appropriations requests for other agencies in the President's annual budget proposal. After Congress approves the appropriations for these other agencies in which CIA funds are concealed, the funds for the Agency are secretly transferred by the Office of Management and Budget to the CIA.[12]

We are informed by appellant in his complaint as to the procedure used by the House of Representatives to approve funds for the CIA.[13] Under this practice the CIA requests the Subcommittee on Intelligence of the House Appropriations Committee to cause appropriations bills for other government agencies to be enlarged beyond their needs so that the excess funds can be transferred to the Agency. The members of the Subcommittee, and the Chairman of the full Appropriations Committee, are informed as to which bills contain funds that can be transferred to the CIA. The funding of the CIA does not, therefore, take place in *total* secrecy; the funding scheme represents a

---

ing the operation of these two processes are to be defined solely by Congress. *See, e. g.* Complaint, ¶ 30, J.A. at 15a; Appellant's Brief at 28.

**8.** 31 U.S.C. § 628 (1970).

**9.** 31 U.S.C. § 696 (1970).

**10.** 31 U.S.C. § 1029 (1970). Appellant also relies on 31 U.S.C. § 66b (1970) as a law of general application. This section, however, imposes no duty on the Secretary of the Treasury to report the expenditure of all public money, as does 31 U.S.C. § 1029, but only to "prepare such reports . . . as will present the re-

sults of the financial operations of the government . . . ."

**11.** 50 U.S.C. § 403f(a) (1970). Sections 403(f)(b)–(e) of Title 50 provides the CIA with various additional exemptions from laws of general application; section 403f(a), however, establishes the basic funding mechanism and is the primary focus of appellant's challenge in this case.

**12.** 50 U.S.C. § 403f(a) (1970).

**13.** Complaint, ¶¶ 33, 34, J.A. at 16a.

very particularized judgment on the part of the House as to which of its members should have access to this funding information. The appellant in this case is not one of the Congressmen who are given access to this information under the House practice.

With respect to the reporting of its expenditures the CIA is exempted from the general requirements:

The sums made available to the Agency may be expended without regard to the provisions of law and regulations relating to the expenditure of Government funds; and for objects of a confidential, extraordinary, or emergency nature, such expenditure of the Director and every such certificate shall be deemed a sufficient voucher for the amount therein certified.[14]

The precise nature and content of the "certificate of the Director" is not clear from the information presented by the parties in this case.[15] The significant point is that the procedure represents the specific judgment of Congress as to flow of information required from the CIA.

The appellant in this case does not question the constitutional sufficiency of the funding and reporting provisions of the CIA Act or the laws of general application outlined above.[16] Rather, appellant's challenge is based on the manner in which the CIA is administered. Although there was confusion in the briefs and at argument concerning this point, there are two related yet analytically distinct causes of action presented by appellant. Appellant contends that the Agency has abused its delegated authority by engaging in certain foreign[17] and domestic[18] activities which are allegedly in excess of the CIA's statutory authority.[19] In his first cause of action appellant seeks a declaratory judgment that these foreign and domestic activities are illegal and injunctive relief to prevent future occurrences. Appellant relies entirely on *Mitchell v. Laird*[20] to support his standing as a Congressman to seek this relief related to the first cause of action.

The appellant's second cause of action, which he has stressed on this appeal, builds on the factual allegations related to the first. Appellant contends that, in carrying out the allegedly illegal foreign and domestic activities, the CIA has improperly utilized the special funding and reporting provisions of the CIA Act, since these provisions are to be used only in connection with authorized activities.[21] Appellant seeks a declaration that the use of the CIA Act provisions for the execution of the allegedly improper activities is illegal, coupled with appropriate injunctive relief.[22] Appellant concedes that his right to information concerning the CIA is to be determined by Congressionally enacted statutes and procedures but contends that the laws of general application, not the exceptions carved out by the CIA Act, govern his right to information concerning those Agency activities in excess of statutory authority.[23] With respect to his standing to seek the relief related to the misuse of the CIA Act, appellant asserts interests different from those

---

**14.** 50 U.S.C. § 403j(b).

**15.** It is not clear, for example, whether the funds expended by the Agency are reported as having been spent by the other agency for which they were originally appropriated. We are uncertain as to the precise amount of information that appellant receives under this scheme.

**16.** Appellant's Brief at 16.

**17.** The foreign activities at issue are found in the complaint, ¶¶ 11, 12, J.A. at 5a–8a.

**18.** The challenged domestic activities are listed in the complaint, ¶ 60, J.A. at 26a–27a.

**19.** Although we will assume, for purposes of the standing determination, that these activities are in excess of the CIA's authority, this conclusion has not been admitted by defendants in this case. See note 26, *infra.*

**20.** 159 U.S.App.D.C. 344, 488 F.2d 611 (1973). The *Mitchell* case is discussed in text at notes 37 to 38, *infra.*

**21.** Complaint, ¶ 21, J.A. at 12a.

**22.** Complaint, J.A. at 29a–30a.

**23.** *See, e. g.,* Complaint, ¶¶ 28, 30, 32, J.A. at 14a–16a. *See also* note 21, *supra.*

asserted to support the first cause of action.[24]

There are two additional points which deserve mention in order to present an accurate description of the nature of appellant's challenge in this case. First, the allegations of improper foreign and domestic activities on the part of the CIA are derived from information which has been put on the public record by the defendants in this case.[25] Although the defendants acknowledge that these activities have taken place, they have not acknowledged any illegality in connection with the activities.[26] In addition, appellant contends that the defendants have stated their intention to continue with similar activities in the future.[27] Thus, Congress would appear to be on notice with respect to past and probable future conduct on the part of the Agency.

The second point concerns the reaction of Congress to this public information regarding CIA activities. Appellant states that the public acknowledgment of the foreign and domestic activities in question "has caused considerable controversy in both Houses of Congress"[28] and has resulted in numerous bills and resolutions being introduced concerning the Agency. Indeed, appellant has filed with this court a list of some 23 bills and resolutions concerning the manner in which the CIA is funded and held accountable that he has sponsored in the past three years. These bills and resolutions, none of which have been approved, have sought to accomplish the same result as is being sought in this litigation.[29] The

House procedure with respect to the funding of the CIA has remained unchanged in spite of the public acknowledgment of actions appellant characterizes as illegal and appellant's legislative efforts.

■■ Having put forth the substantive merits of appellant's claims, it remains to relate this aspect of the case to the issue of standing. As the Supreme Court stated in *Warth v. Seldin,*

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.[30]

This standard of review dictates that we assume (1) that the CIA has engaged in certain foreign and domestic activities in excess of its statutory authority, and (2) that the funding and reporting provisions of the CIA Act have been utilized in an illegal manner. These assumptions as to illegality do not in and of themselves confer standing on *anyone* to challenge the illegality.[31] Rather, *the proper inquiry is whether the illegality does injury to an interest of the complaining party.* It is to a detailed examination of the interests and injuries asserted by the appellant as a Congressman that our analysis now turns.

## II. THE INTERESTS ASSERTED BY APPELLANT

■ Although there has been no systematic or precise[32] articulation by appellant of

24. These interests are examined in detail in Part II.B., *infra.*

25. Complaint, ¶ 11, J.A. at 5a.

26. Complaint, ¶ 13, J.A. at 8a–9a.

27. Complaint, ¶ 14, J.A. at 9a.

28. Complaint, ¶ 16, J.A. at 9a.

29. These bills and resolutions were lodged with this court pursuant to an order of 1 October 1976. *See, e. g.,* H.R. 8592, 93d Cong., 1st Sess. (1973).

30. 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

31. *United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Under this analysis there may indeed be illegal or unconstitutional actions which will go unchallenged *in a federal court* due to the lack of a proper party to sue. This conclusion reinforces a basic idea in the law of standing that it is not the mere existence of illegality or harm which confers standing; rather, it is the *relationship* between the harm and the particular complaining party that is the focus of the standing doctrine. *See* note 68, *infra.*

32. Appellant, in his status as a Congressman, has a wide range of rights, duties, and interests related to this official capacity. Thus, it is not sufficient for appellant or any other legislator merely to allege this status as a ground for

the interests that support his standing to sue as a Congressman, such an articulation is necessary in order to test fully and vigorously appellant's claim to standing against the standards established in the case law. Accordingly, in this section we shall examine appellant's two causes of action separately, in each case identifying and characterizing the interests which appellant believes will support his standing as a legislator. With respect to each of these interests, particular care will be taken to identify the source of the asserted interest and the nature of the alleged harm to that interest.

### A. The First Cause of Action—Allegedly Illegal Foreign and Domestic Activities

Appellant asserts three distinct interests to support his standing to seek a declaratory judgment that certain foreign and domestic activities of the CIA are illegal.

With respect to the first, appellant claims an interest in the possible impeachment of the defendants which could result from a declaration that the activities in question are illegal. This power of Congress to impeach derives from specific provisions in the Constitution.[33] As regards the impeachment rationale for standing, the focal point for analysis is to be found in the nature of the harm to this interest that appellant claims to have suffered. Appellant states that a declaration of illegality in this case would "bear upon" his duties and rights "to consider, initiate, support or vote for the impeachment of the defendants . . . and other civil officers [34] of the United States. . . ." [35]

The crucial words in this allegation are "bear upon"; appellant does not assert that the alleged illegality on the part of the CIA has *injured* his interest in the impeachment process but rather that such illegality *relates to* this interest. In other words, although the alleged illegality has in no way diminished or otherwise invaded the Congressional power to impeach, a judicial declaration of illegality would be helpful and relevant (*i. e.,* "bear upon") to appellant in *deciding whether* to pursue the impeachment of the defendants in this case. There is no allegation that a declaration of illegality would force the Congress or appellant to commence impeachment proceedings, nor does it appear that such a declaration as to past Agency activities would provide appellant with more basic information than he already possesses. Appellant believes that he has established a sufficient link between the alleged illegality and his interest in the impeachment process by asserting that the former merely "bears upon" the latter.

Most critically, he does not allege that he as a litigant would profit or lose, depending upon our determination of legality or illegality.[36]

In using the phrase "bears upon" to describe the nature of the harm to his protected interest, appellant duplicates the language of this court in *Mitchell v. Laird.*[37] In that case the court upheld the standing of thirteen members of the House of Representatives to seek a declaratory judgment that the war in Indo-China was unconstitutional. In *Mitchell* the court based its grant of standing in part on the ground that "a declaration [of unconstitutionality] would bear upon the duties of plaintiffs to

---

standing. Such generalized allegations do not provide a court with enough information as to the particular interests at stake in the litigation. Thus, legislators, like all other plaintiffs, must be precise in defining the particular interests which they seek to vindicate in the federal court system.

**33.** Article II, Section 4.

**34.** To the extent that appellant seeks information relating to the possible impeachment of "other civil officers," he has run afoul of the requirement of causation in the law of stand-

ing. That is, the harm of which appellant complains cannot be traced to this undefined class of civil officers who are not a party to this suit. For a discussion of this causation requirement, see note 68, *infra.*

**35.** Complaint, ¶ 17, J.A. at 10a–11a.

**36.** See analysis under III.B., *infra,* in text at note 91 *et seq.*

**37.** 159 U.S.App.D.C. 344, 488 F.2d 611 (1973).

consider whether to impeach defendants . . . ."[38] Thus this court has indeed spoken on one occasion as if a sufficient relationship existed between a claimed illegality and an asserted interest if the former merely bears upon the latter. It is clear, however, that but for the language of *Mitchell* on the issue of standing, the allegations as cast by appellant in this case with respect to the impeachment rationale would not suffice to confer standing on the appellant in his capacity as a Congressman. The strength of appellant's impeachment rationale thus depends on the status of the *Mitchell* language in *Mitchell* itself and the present status of the *Mitchell* reasoning in light of subsequent decisions. This inquiry will be made in Part III of the opinion by examining developments in the law of standing since the *Mitchell* case was decided.

▆ The second and third interests put forth by appellant to support his standing to seek a declaratory judgment are also derived from the *Mitchell* case. In *Mitchell* the court opined that, in addition to the impeachment rationale, Congressional standing could be supported by the fact that a declaratory judgment

> would bear upon . . . plaintiffs' quite distinct and different duties to make appropriations . . . , or to take other legislative actions related to [the war] . . . or enacting other civil or criminal legislation.[39]

As with the impeachment rationale, the source of these asserted interests is Article I of the Constitution;[40] again, appellant relies on the "bears upon" language of *Mitchell* to establish the harm to these interests. Appellant does not claim that a declaration of illegality would cause him to take any legislative action whatsoever; rather, such a declaration would guide him in making decisions relating to potential legislative action. In addition, appellant makes no claim in this cause of action that the alleged illegality has injured the Article I legislative power of the Congress.[41]

---

38. *Id.* at 347, 488 F.2d at 614. It is important to note that the Court's grant of standing in *Mitchell* was made *sua sponte*, after concluding that " . . . plaintiffs are not limited by their own concepts of their standing to sue." *Id.*

39. *Id.* These interests and injuries were also recognized *sua sponte* by the court.

40. Article I, Section 7, clause 1 (appropriations power); Article I, Section 1 (general lawmaking power.)

41. There is considerable confusion surrounding the concept of "institutional injury" in this case. Appellant is a member of an institution known as the United States Congress or, more particularly, the House of Representatives. Appellant has not been authorized to prosecute this suit by the House, and he therefore sues in his capacity as an individual member of this institution. One of the techniques by which appellant seeks to establish injury *to himself* is by establishing injury to the institution (Congress) which *in turn* injures him. Thus, the argument related to institutional injury is an indirect or derivative argument in which the harm is traced through from the institution to the individual member.

Much of the confusion regarding this concept of institutional injury derives from appellee's belief that indirect injury is not sufficient for purposes of standing. Appellee's Brief at 14,

16. Although there is language to this effect in older Supreme Court cases (*see, e. g., Ex Parte Levitt,* 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937); *Chicago v. Atchison, T. & S. F. Ry. Co.,* 357 U.S. 77, 83, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958)), a direct injury is not required under current Supreme Court doctrine. As the Court stated in *Warth v. Seldin,*

> The fact that the harm . . . may have resulted indirectly does not in itself preclude standing. . . . But it may make it substantially more difficult to meet the minimum requirements of Art. III. . . . " 422 U.S. at 504–05, 95 S.Ct. at 2208.

This same idea was expressed in *Kennedy v. Sampson* when the court stated that

> [T]o the extent that Congress' role in the government is . . . diminished, so too must be the individual roles of each of its members . . . [T]he contention that appellee's interest in the pocket veto is 'derivative' is correct. It is derivative, but it is nonetheless substantial. 167 U.S.App.D.C. at 198, 511 F.2d at 436.

Therefore, in order for appellant successfully to employ this technique of showing indirect injury, he must show 1) there has been injury-in-fact done to the Congress, and 2) that he, as an individual legislator, has been injured-in-fact because of the harm done to the institution. Although this technique is sound in theory, it has not been executed soundly in this case.

Inconsistent allegations render appellant's claims with respect to institutional injury in-

It is appellant's contention that any of the three interests outlined above support his standing to seek the declaratory judgment. This is not an unreasonable contention, since the *Mitchell* court spoke of these interests as independent grounds for standing.[42] It bears repeating at this point, however, that this is all of appellant's case on the first cause of action. Appellant has asserted no novel interests or injuries to support his first theory, but relies entirely on the language in the *Mitchell* case. The question as to whether the "bears upon" language of *Mitchell* retains any vitality in the current context of Supreme Court decisions as an acceptable standard by which to judge the harm alleged by a legislator is thus central to all three interests urged by appellant in support of the first cause of action.

### B. The Second Cause of Action—Use of the CIA Act Concealment Provisions

▮▮▮▮ Appellant contends that the use of the funding and reporting provisions of the CIA Act to carry out allegedly illegal activities injuries "his rights and interests as a Congressperson to participate in the legislative process."[43] Much of appellant's argument to this court has been concerned with the impact of Agency activities on the general legislative process.[44] Such generalized concerns do not provide this court with sufficient information relating to the personal interests of the appellant to support a claim of standing.[45] We must instead examine the particularized interests and injuries claimed by appellant as they relate to the second cause of action. Appellant's specific interests will be divided into two categories for purposes of analysis: (1) interests

substantial. Appellant first contends that the performance of illegal activities by the CIA "constitute[s] a blatant usurpation and disregard of and challenge to the role of Congress in the constitutional scheme to prescribe the activities of agencies created by Act of Congress." Complaint, ¶ 18, J.A. at 11a; *see also* Appellant's Brief at 6, 11, 17, 25. After making this allegation that the "power" to prescribe" has been injured, appellant himself goes on to show that this is not the case. Since the CIA activities at issue in this case became public knowledge, the House has considered numerous bills and resolutions relating to the agency (Complaint, ¶ 16, J.A. at 9a–10a). Indeed, at least 23 of these measures were introduced by appellant (see note 29, *supra*). One specific piece of legislation has been enacted (the Foreign Assistance Act of 1974, 22 U.S.C. § 2422) which prohibits the CIA from engaging in the type of foreign activities complained of by appellant in this case. *See* Appellant's Brief at 9 n.4. The thrust of these statements is that the legislative process is operating in an unimpeded manner; the power to prescribe remains, by appellant's own admission, completely intact. Thus, since appellant has in effect alleged no cognizable injury to the institution (Congress), he cannot logically trace this nonexistent harm through to himself as an individual member. The institutional argument fails *in this case*.

We need not express a view on the necessary relationship between institutional harm and individual harm when a legislator seeks a recognition of standing. It is clear that each individual harm to a legislator need not always be accompanied by an institutional harm (see *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)) and that institutional harm *can* result in individual harm (see *Kennedy v. Sampson, infra* Part III). Beyond this we need not and do not go. We do emphasize, however, that when a legislator has not been authorized to sue on behalf of the institution to which he belongs, the crucial inquiry relates to his *personal* injury and stake in the controversy, regardless of its source.

In summary, although a plaintiff cannot rely solely on institutional injury to establish standing, he can allege that that harm to the institution has resulted in harm to himself. In this case there are no allegations which satisfy the first stage of analysis relating to institutional injury in fact.

42. 159 U.S.App.D.C. 344, 347, 488 F.2d 611, 614 (1973).

43. Appellant's Brief at 4.

44. *See, e. g.,* Complaint ¶ 28, J.A. at 14a (Appellant claims a right to "otherwise participate in a legislative capacity . . . ."); and Appellant's Brief at 7.

45. The requirement of a personal stake in the controversy sought to be adjudicated is central to the law of standing. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). See also note 68, *infra*.

related to the enactment of legislation, and (2) interests relating to specific legislation that has already been enacted.

 1. *Enactment Interests.* Appellant focuses on two facets of the legislative process in which he believes he has been injured in his ability to enact legislation.[46] The first and primary focus of appellant's attention is the appropriations process as established by the laws of general application outlined in Part I, *supra.*[47] Under these general laws appellant claims an interest in "consider[ing], debat[ing],

[and] vot[ing] upon . . . Executive requests for appropriations for the Agency,"[48] and in ensuring that "the Executive seek and obtain express and specific appropriations from Congress for the Agency, except as the Executive may have been constitutionally authorized by statute to do otherwise."[49] According to appellant's interpretation, the relevant statutes confer on him a right to have appropriations requests for unauthorized activities submitted separately by the CIA and considered by Congress in accordance with normal procedures.[50]

---

**46.** Appellant asserts two additional interests which deserve mention. First, appellant claims an interest under 31 U.S.C. §§ 41 *et seq.,* 53, and 1171 "in ensuring that the Agency is subject to strict scrutiny by the General Accounting Office (GAO) and is subject to reports to Congress by the Comptroller General" with respect to any illegal activities. Complaint, ¶ 47, J.A. at 21a. These statutory sections cited by appellant refer to *one* of the methods by which Congress and the public receive information concerning the expenditure of federal funds. Congress has, however, specifically exempted the CIA from these requirements. Appellant claims that scrutiny by the GAO and Comptroller would "serve to guarantee that funds appropriated by Congress . . . were used by the Agency in accordance with law." *Id.* This interest is more relevant to appellant's original claims of citizen and taxpayer standing (Complaint, ¶ 50, J.A. at 23a) which have not been pursued in this appeal (See note 5, *supra*). To the limited extent to which appellant claims that the denial of this information injures his general lawmaking duties regarding the CIA, this contention relies on *Mitchell v. Laird* and is rejected by our analysis in Part III.B., *infra.*

Appellant also claims an interest under 5 U.S.C. §§ 552, 7102 in obtaining information concerning the Agency. Complaint, ¶ 49, J.A. at 23a. The Agency is specifically exempted from these requirements by 50 U.S.C. §§ 403g, 403(c). To the extent that appellant merely seeks additional information, this claim also relates more closely to his status as a citizen and taxpayer, Complaint, ¶ 50(c), J.A. at 24a, and is, in addition, barred by the causation requirement in the law of standing since Congress completely controls the flow of information concerning the CIA and is not a defendant in this case. See note 68, *infra.* Appellant also states that the information normally provided under 5 U.S.C. ¶ 552 would be "relevant and helpful" to him in his general lawmaking duties, Complaint, ¶ 49, J.A. at 23a. This aspect of the claim thus rests on a notion similar to that of the "bears upon" language of *Mitch-*

*ell v. Laird* (note 37, *supra*) and is covered by our analysis in Part III.B., *infra.*

Therefore, with respect to both of these interests, appellant states claims which are more closely tied to citizen and taxpayer standing and thus not relevant to this appeal. To the limited extent to which these claims relate to appellant's status as a Congressman, they both rely on *Mitchell v. Laird* and therefore must fail under the analysis in Part III.B., *infra.*

**47.** See text and notes at notes 7 to 20, *supra.* Once again it is important to emphasize that appellant does not challenge the constitutional sufficiency of these appropriations laws, and that he repeatedly recognizes that his rights in this process are determined by the Congress.

**48.** Complaint, ¶ 28, J.A. at 14a.

**49.** *Id.*

**50.** Appellant's Brief at 13. There are several problems with this contention; the identification of these problems will aid in understanding the true nature of appellant's position in this case. In making this contention appellant seeks to establish that he has been personally disenfranchised by his inability to vote separately on unauthorized CIA activities and thus to come within this court's ruling in *Kennedy v. Sampson,* 167 U.S.App.D.C. 192, 511 F.2d 430 (1974) (For a discussion of this aspect of the *Kennedy* case, see text at notes 111 to 112, *infra.*) If appellant is to be given this right to a separate consideration of illegal activities, *someone* (presumably the appellant or his colleagues in the Congress) must determine beforehand that certain proposed or prospective activities of the CIA will be in excess of the Agency's authority. In order for this determination to be made, the person making the judgment would have to have access to *all* CIA information in order to sort out the illegal from the legal proposals so that only the former would be separately considered. This necessi-

Appellant contends that, since the CIA has engaged in activities allegedly in excess of its statutory authority, he "cannot consider and otherwise act in a legislative capacity with regard to *any* appropriations bill . . ." [51] because funds provided in these bills may be transferred to the Agency and used for improper purposes. The heart of the contention is that appellant's *prospective* votes on appropriations measures are impaired because of his uncertainty as to the ultimate destination and disposition of the funds involved. According to appellant this lack of information impairs the quality of his participation in the appropriations process and thus constitutes a significant injury to him in his capacity as a Congressman. Appellant does not allege that he will be denied the opportunity to vote on any appropriations bills which are to come before the House; indeed, appellant admits that he is given full and equal rights under the current House practice.

When appellant claims that his right to participate in the appropriations process has been injured, he is in truth arguing that his participation *as he interprets the relevant statutes* has been impaired. Thus, the

source of appellant's asserted damage to his interest in the appropriations process does not derive directly from a statute, but rather from his interpretation of what should be the correct legislative operation of the entire statutory scheme relating to the CIA. [52] In focusing on the impairment of future votes as constituting injury to these interests, appellant relies on this court's decision in *Kennedy v. Sampson,* [53] in which protection was afforded to certain interests related to a specific vote that had already been cast. [54] In this case appellant would have us extend this protection to include prospective votes on all appropriations measures. The appropriateness of this request will be examined in Part III, *infra.*

Building on his interpretation of the appropriations and CIA statutes, appellant claims additional injury because his "need for [the CIA] information arises from his status as a legislator and relates to his effectiveness as such." [55] The reasoning behind this claim is that, since appellant could be a more effective participant in the appropriations process if he had access to the CIA funding and reporting information

ty, in addition to posing problems of logic, points to appellant's true, underlying purpose in this litigation: to increase the flow of information from the CIA to the appellant. It is, in other words, an attempt to get more information than the Congress has seen fit to give him. But appellant realizes that his rights to information are controlled by Congress (see note 23, *supra*) and that he * MESSAGE(S) *MORE SECTIONS FOLLOWmust *relate* this need for information to his Congressional duties, rights, and interests. (Appellant appears to recognize this in his Brief at 21). In several instances appellant has done this, and we have described these in detail in Part II. But to the extent that the need for information is not linked to a Congressional duty or interest, the standing claim must fail for the lack of a proper defendant; the defendants in this case have not *caused* the lack of information complained of by appellant. See note 68, *infra.*

A similar problem relating to causation also undermines this argument relating to the withdrawal of the opportunity to vote on unauthorized activities. The scheduling of votes is within the power of the House of Representatives; it is this body, and not the defendants in this case, which has seen fit not to subject certain areas of CIA activity and operations to separate legislative consideration. Thus, any *complete* withdrawal of the opportunity to vote has been caused by the House, which is not a party to this case.

In summary, the argument relating to the withdrawal of the opportunity to vote is an artificial attempt to come within the *Kennedy* case which has as its purpose the gathering of more information concerning both the legal and allegedly illegal activities of the CIA. The fundamental defect in the argument is one of causation in that the defendants in this case do not control either the flow of information to Congress or the scheduling of votes in the House of Representatives. This argument, as well as others presented in the case, also raise problems relating to the separation of powers which will be discussed in Part IV, *infra.*

51. Appellant's Brief at 15.

52. *See* note 50, *supra.*

53. 167 U.S.App.D.C. 192, 511 F.2d 430 (1974).

54. See text and notes at notes 111 to 112, *infra,* for a discussion of the *Kennedy* case.

55. Appellant's Brief at 21.

that he seeks, the denial of that information must constitute a significant injury. Appellant's argument, however, assumes a subjective standard for determining effectiveness; that is, from *his* perspective he would be a more effective legislator if the requested relief were granted; from his fellow legislators' perspective, appellant—along with a large majority of his fellow members of the House—will be a more effective legislator if he is not informed of the details of CIA funding and reporting, or at least the House as a whole will be more effective in exercising its responsibilities in regard to the CIA. The effectiveness argument put forth by appellant seeks to establish injury beyond the actual casting of a vote and focuses on his overall participation in the legislative process. This argument also relies on an extension of language in the *Kennedy* case.[56]

The second enactment interest put forth by appellant relates to 31 U.S.C. § 1029.[57] It is appellant's contention that he has a right to receive a regular statement and account of receipts and expenditures with respect to all CIA activities which are in excess of statutory authority.[58] The nature of the harm alleged to this interest is important to note. Appellant contends that the requested information would be "helpful and relevant" to him in

> reviewing and in openly debating and discussing in Congress and with his constituents the appropriateness of the sums received and expended by the Agency, and in considering, initiating, debating

and voting for legislation in connection therewith.[59]

Appellant does not allege that he is denied the reports submitted pursuant to 31 U.S.C. § 1029 but complains that the reports do not contain sufficient information concerning any illegal activities carried out by the CIA. This information is needed, according to appellant, so that he can discharge his Congressional duties, broadly defined in this instance to include consultation with his constituents. In other words, this information "bears upon" the asserted Congressional rights and duties; thus, appellant is asking the court to apply and extend[60] the *Mitchell* holding to this facet of the legislative process. Once again, this ground for standing must be analyzed in connection with our current assessment of the *Mitchell* rationale, a task reserved for Part III of this opinion.

2. *Post-Enactment Interests.* Appellant takes an expansive view of the nature of the legislative process in claiming that his interests in this process extend to the manner in which previously enacted statutes are administered. Appellant first claims an interest "in ensuring that no funds appropriated by Congress and for which he has voted are transferred to and used by the Agency"[61] for activities in excess of its authority. In this allegation appellant claims an interest in seeing that all laws for which he has voted are administered in accordance with the statutory mandate.[62] At oral argument[63] appellant introduced the notion that he occupies a "special rela-

---

**56.** See discussion in text at notes 112 to 116, *infra.*

**57.** See note 10, *supra.*

**58.** Complaint, ¶ 46, J.A. at 21a.

**59.** *Id.*

**60.** The *Mitchell* language would have to be extended because of appellant's broad definition of his protected interests in the legislative process which include, *inter alia*, consultation with constituents.

**61.** Complaint, ¶ 43, J.A. at 19a.

**62.** Again, it is appellant's interpretation of the laws that forms the basis for his request for

standing; appellant believes that his own suspicions of *ultra vires* activity are sufficient to invoke the federal judicial power. Although, for purposes of standing, we assume that the CIA activities in question are illegal, this notion that appellant's interpretation of the law is a sufficient basis for litigation is quite disturbing and will be discussed more fully in text at Part IV, *infra.*

**63.** This argument was apparently introduced because the statutes cited by appellant for this contention (the laws of general application, Part I, *supra*) clearly do not confer such a special post-enactment interest in a Congressman. For an analysis of this interest, see text and notes at notes 120 to 123, *infra.*

tionship" to the legislative process that supports this interest in the post-enactment administration of certain [64] laws. Appellant has not delineated the precise contours of this "special relationship" but it presumably derives solely from his status as a lawmaker. The argument for standing rests on the notion that those who make the laws are inherently injured by any illegality associated with these laws.

The second post-enactment interest asserted by appellant concerns the effect of the CIA's allegedly illegal activities on votes already cast by appellant. Appellant contends that these votes "are impaired to the extent that . . . appropriations are used by the Agency for unauthorized activities." [65] This allegation relies on a relation-back notion in which events subsequent to a vote detrimentally affect the quality or effectiveness of that vote. Appellant does not allege that he was denied the opportunity to vote at any time in the past, nor does he specify the exact manner in which his votes have been impaired. The impairment appears to derive from appellant's subjective judgment that any illegal activities on the part of the CIA undercut the basis on which he cast his votes and thus these votes are diluted in quality or impaired in effectiveness. In asserting in-

jury to previously cast votes, appellant seeks to come within the holding of the *Kennedy* case; [66] we shall be comparing appellant's position to that adopted in *Kennedy* in Part III.

## III. ANALYSIS OF APPELLANT'S CONGRESSIONAL INTERESTS

### A. Principles Basic to Standing of all Litigants

1. When analyzing the standing claims of a Congressman it is important to keep in mind the nature and source of the analytical standards to be employed. The *most basic point* to consider is that *there are no special standards for determining Congressional standing questions.* Although the interests and injuries which legislators assert are surely different from those put forth by other litigants, the technique for analyzing the interests is the same. The source for these standards and techniques is to be found in the opinions of the Supreme Court. Although the Supreme Court has not directly faced the question of standing to allow individual members of the legislative branch to seek judicial relief from action taken by members of the executive branch,[67] the Court's numerous rulings on standing in other contexts are fully

---

**64.** Appellant claims an interest only in those statutes "of sufficient particularity" which have "a sufficiently discrete impact upon the legislative process. . . ." Appellant's Reply Brief at 8. Appellant believes that the laws of general application, Part I, *supra,* meet such a description, "unlike the vast majority of laws." *Id.* The source of the interest or the injury does not, however, determine the particularity of the injurious impact on the appellant and is thus not relevant as such to the standing analysis. See text at notes 102–104, *infra.*

**65.** Appellant's Brief at 15–16.

**66.** See discussion in text at notes 110 to 111, *infra.*

**67.** The Supreme Court has decided cases in which legislators have been parties to the suit. The closest analogy to the present case is to be found in the 1939 case of *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385. The case involved a 1924 proposal by Congress to add a Child Labor Amendment to the United States Constitution. In the next year the Kan-

sas legislature adopted a resolution rejecting the proposed amendment. In 1937 the Kansas Senate again voted on the amendment, splitting on the issue by a vote of 20 to 20. The Lieutenant Governor broke the tie by voting in favor of the amendment; the Kansas House of Representatives also approved it. Three representatives and 21 Senators, including all 20 who had voted against the amendment, then sued in the Kansas courts, challenging the Lieutenant Governor's right to vote. The Kansas Supreme Court found that his vote was properly cast and denied the claim. The United States Supreme Court took the case on certiorari.

The Supreme Court granted standing to the 20 senators who had originally voted against the amendment, stating that these plaintiffs had a "plain, direct, and adequate interest in maintaining the effectiveness of their votes," 307 U.S. at 438, 59 S.Ct. at 975. This language was subsequently relied on by this Circuit in *Kennedy v. Sampson* (see note, 113, *infra*). The major distinguishing factor between *Coleman* and the present case lies in the fact that the plaintiffs in *Coleman* were *state* legislators.

applicable to this particularized situation. Although the Supreme Court has not faced the standing issues as presented in this case, this court has done so in the *Mitchell* and *Kennedy* cases. The precedential value of these opinions for appellant lies in the degree to which the reasoning employed continues to be consistent with the broader framework established by the Supreme Court.

Thus, in analyzing appellant's standing claims in this case, we examine both the opinions of this court and the Supreme Court, recognizing that the Supreme Court's general framework controls the final determination. After stating these basic principles concerning the standing doctrine, we shall examine the two causes of action separately to determine if appellant comes within the decisions of this court or the reasoning of relevant Supreme Court decisions.

2. There is no single test or formula to be derived from the case law to determine if a particular complaining party has standing to sue. Rather, the case law provides *a series of inquiries designed primarily*[68] *to determine if the complaining*

---

A separation of powers issue arises as soon as the *Coleman* holding is extended to United States legislators. If a federal court decides a case brought by a United States legislator, it *risks interfering with the proper affairs of a* coequal branch. Although this concern for the separation of powers will not always operate to deny standing to a legislator (see *Powell v. McCormack,* 395 U.S. 486, 518–59, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), it is a delicate issue of which we properly take notice. See Part IV, *infra.*

**68.** At least four separate inquiries can be distilled from the Supreme Court cases on standing. The first, and primary inquiry, concerns the existence of "injury in fact, economic or otherwise," *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). This requirement is the irreducible constitutional minimum which must be present in every case. If the court finds that there is no injury in fact, "no other inquiry is relevant to consideration of . . . standing," *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 227 n. 16, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974). *See also Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

If injury in fact is found to exist, the inquiry then focuses on the interests being asserted by the complaining party to determine if the interests are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," *Ass'n of Data Processing Serv. Organization, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). *See also Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This is not a constitutional requirement, *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and need not be faced in the absence of a finding of injury. Thus, if no injury is found, a court need not render a decision on the validity or scope of the interests at stake in the litigation.

If the first two inquiries are answered in the affirmative, the analysis turns to the question of causation. In order to be granted standing, a complaining party must allege "some threatened or actual injury *resulting from* the putatively illegal action . . .," *Linda R. S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973) (emphasis added). The injury must be such "that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court," *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). If this requirement of causation cannot be met, the standing claim must fail for the lack of a proper defendant.

If the complaining party has met the requirements relating to injury, interest, and causation, there remains a fourth inquiry to be answered. A plaintiff must show "an injury that is likely to be redressed by a favorable decision," *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). This requirement "insures the framing of relief no broader than required by the precise facts to which the court's ruling would be applied," *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974). All four of the inquiries must be answered in the affirmative in order to make out a valid claim of standing; if a negative answer is given to any of the inquiries, there is no need to proceed to the next stage of analysis. It is therefore important to keep in mind that a valid claim of standing rests on more than just assertion of cognizable injury.

At oral argument appellant advanced the notion that he had somehow suffered "more" injury than the injury recognized in "the environmental cases" decided by the Supreme Court and, therefore, should be granted standing. In making this contention appellant ap-

*party has suffered some injury in fact.* This requirement of injury in fact is a *constitutional* requirement designed to implement in part the Article III limitation on federal judicial power to "cases or controversies." [69] The inquiry into the existence of injury is thus the crucial inquiry; if it is determined that no injury exists, there is no need to pose or answer the other inquiries in the case law.[70] The determination as to injury must necessarily proceed on an *ad hoc* scrutiny of the facts in each case. We have attempted to lay the groundwork for this close scrutiny by a careful exposition of all of appellant's claims in Part II, *supra.*

 3. Before turning to the analysis of the two causes of action presented in this case, it is necessary to explore briefly the basic requirement which underlies the standing doctrine. Such an exploration is necessary because all of the specific inquiries required to be made under the framework provided in the case law must ultimately be tested against this requirement.

In *Baker v. Carr,* the Supreme Court stated that ". . . the gist of the question of standing" is whether the party has "alleged such a personal stake in the outcome of the controversy as to assure [the] concrete adverseness which sharpens the presentation of issues . . . ." [71] This concern was reinforced in *Flast v. Cohen* when the Court stated that the standing doctrine serves to "limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." [72] Thus, the *basic concern* of the standing doctrine is that *the individual complaining party have such a strong connection to the controversy that its outcome will demonstrably cause him to win or lose in some measure.* The specific inquiries as to injury and other matters, to which we now turn, are all aimed at promoting this underlying concern, and thus limiting the exercise of federal judicial power to "cases or controversies."

parently had reference to cases such as *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) in which damage to the environment was the source of the personal injury recognized. In making this argument, which has some superficial appeal, appellant demonstrates a basic misunderstanding of the manner in which the standing doctrine operates. The magnitude of the harm on which a party's claim is based is relevant only to determining injury-in-fact; even in this regard, the harm need not be substantial but merely identifiable.

Once the constitutional threshold of injury-in-fact is established, the magnitude of the harm becomes irrelevant as such; the primary concern then becomes the *relationship* between the identifiable harm and the complaining party (i. e., the inquiries relating to interest, causation, and redressability). Thus, the fact that one party may have suffered "more" injury than another does not necessarily entitle the former to have standing in the federal courts.

Appellant in this case has failed to realize that he must trace the relationship between the harm he asserts and his individual status. His assertion that he has suffered "more" injury is insufficient. Were the rules of standing otherwise, a court either would have to accept the subjective feelings of injury expressed by litigants or would have to make these judgments

itself on a subjective basis. We fail to see how meaningful standards could be devised to make these determinations as to which injury is "more" or "worse." In any case, an acceptance of appellant's line of reasoning would surely steer the federal courts into areas inconsistent with the limitations of Article III. *See* Part IV, *infra.*

**69.** *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). ("Generalizations about standing to sue are largely worthless as such. One generalization is, however, necessary and that is that the question of standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies.' ")

**70.** *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 227 n. 16, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974). ("Until a judicially cognizable injury is shown no other injury is relevant to consideration of citizen standing.")

**71.** 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

**72.** *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

B. *The First Cause of Action—Alleged Illegal Foreign and Domestic Activities*

All three interests asserted by appellant to support standing to seek a declaratory judgment that the CIA activities in question are illegal rely on the language and reasoning in two paragraphs of *Mitchell v. Laird.*[73] Appellant's first cause of action is nearly identical[74] in form to that presented by the plaintiffs in *Mitchell.* Thus the relevant inquiry, as indicated in II.A., *supra,* is whether the "bears upon" language of *Mitchell* as a test for determining judicially cognizable injury to a Congressional interest—such as impeachment, appropriations, and general lawmaking—will support appellant's claim of standing to seek a declaratory judgment. In light of subsequent decisions of the Supreme Court and this Circuit, as well as the position of the standing issue in *Mitchell* itself, we conclude that this test clearly does not support a claim of standing in this case.

First of all, the language of *Mitchell* on which appellant totally relies for his first cause of action was written on an issue which the Supreme Court has later explained need not have been decided,[75] *i. e.,* it was dicta and not the holding in *Mitchell.* The ultimate issue which this court decided in *Mitchell* was justiciability, *i. e.,* that the question on the merits was "beyond the judicial power conferred by Article III of the United States Constitution."[76] When in the circumstances of both *Mitchell* and this case the question of justiciability is raised, there are two subsidiary issues which a court must affirmatively answer before reaching the merits. One is that the parties do have standing and the other is that the merits do not constitute a political question. As the Supreme Court pointed out in *Schlesinger v. Reservists to Stop the War,* normally courts "turn initially, although not invariably,[5] to the question of standing to sue."[77] The Supreme Court explained in the footnote that there is no "fixed rule as to the proper sequence of judicial analysis of contentions involving more than one facet of the concept of justiciability,"[78] citing the Second Circuit's decision in *DaCosta v. Laird,*[79] which held, "The standing of a party need not come into question if a court determines that for other reasons the issue raised before the bench is non-justifiable."[80]

In *Mitchell* this Circuit held that the plaintiffs could not prevail because ". . . we are faced with what has traditionally been called a 'political question' which is beyond the judicial power conferred by Article III of the United States Constitution."[81] Thus, according to the Supreme Court in *Reservists* and the Second Circuit in *DaCosta,* this court's pronouncements on the standing of the plaintiffs in *Mitchell* were unnecessary; the existence of a political question settled that there was no justiciability, so the answer to the standing question was rendered immaterial. Or, as the Supreme Court characterized the Second Circuit's decision in *DaCosta,* "That court thus held in effect that if no justicia-

---

**73.** 159 U.S.App.D.C. 344, 488 F.2d 611 (1973). See discussion in Part II A, *supra.*

**74.** In *Mitchell* the plaintiffs sought a declaratory judgment that the Executive actions in question were unconstitutional; in this case the requested declaratory judgment relates to an alleged excess of *statutory* authority on the part of the Executive.

**75.** *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 215 n.5, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

**76.** 159 U.S.App.D.C. 344, 349, 488 F.2d 611, 616 (1973).

**77.** 418 U.S. 208, 215, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706 (1974). Footnote 5 is from the text of the *Schlesinger* opinion and is discussed at nn. 78–82, *infra.*

**78.** *Id.* at n.5.

**79.** 471 F.2d 1146 (2d Cir. 1973).

**80.** *Id.* at 1152.

**81.** 159 U.S.App.D.C. 344, 349, 488 F.2d 611, 616 (1973).

ble question is presented no one has standing." [82]

Indicating the inherent weakness of the language on standing in *Mitchell* as the sole support for appellant's position here, we note that this court's remarks were made on an issue which was neither briefed nor argued by the parties, and, further, that both Chief Judge Bazelon and Judge Tamm, who sat in *Mitchell* and subsequently sat in *Kennedy v. Sampson,*[83] did not see fit in *Kennedy* to rely upon *Mitchell* on the question of standing, although plaintiff in *Kennedy* had relied heavily on the *Mitchell* language in the District Court.[84]

Turning now to general Supreme Court doctrine, the most consistent theme expressed by the Supreme Court on the question of standing is that a party must allege "a distinct and palpable injury to himself." [85] This injury must be "a particular concrete injury" [86] which amounts to "a claim of specific present objective harm or a threat of specific future harm." [87] Appellant has not met this most basic standard in his first cause of action. The non-intelligence related foreign and domestic activities of the CIA, the illegality of which we assume for purposes of deciding standing, are not linked with any degree of specificity to appellant's Congressional interests. The essence of the injury in fact concept is the *frustration* of some right or interest; appellant alleges no such frustration of his interests under the first cause of action but relies on a relevance standard to establish injury. The information about the relationship between the assumed illegality on the part of the CIA and appellant's Congressional interests is nonspecific and devoid of allegations which establish a discernible *injurious* impact by the former upon the latter. Since there are no allegations of particular injury, appellant's claim with respect to the relevance of a declaratory judgment to his Congressional duties must fail.[88]

■ An additional objection to the allegations related to the first cause of action relates to the fact that these contentions are future-oriented. The fact that harm or injury may occur in the future is not necessarily fatal to a claim of standing.[89] But the fact that the alleged harm is to occur in the future can, as in this case, lessen the concreteness of the controversy and thus mitigate against a recognition of standing. It must be emphasized that we have concluded that no claim of cognizable injury has been made in this first cause of action; however, if the opposite were true, the claim would fail because the illegality of the CIA has not been traced into "the context of a specific live grievance." [90] The harm alleged by appellant in the first cause would take place, if at all, at some undetermined time in the future when Congress exercised its powers relating to impeachment, appropriations, or general lawmaking. As the time span between challenged activity and the resulting harm to a protected interest increases, it becomes more difficult to maintain the credibility of the specific link between the two. If this link-

---

**82.** 418 U.S. 208, 215 n.5, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706 (1974).

**83.** Judge Tamm authored the court's opinion in *Kennedy,* while Senior District Judge Wyzanski of the District of Massachusetts wrote for the court in *Mitchell.*

**84.** 364 F.Supp. 1075, 1079 (D.D.C.1973).

**85.** *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

**86.** *United States v. Richardson,* 418 U.S. 166, 177, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).

**87.** *Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972).

**88.** The two circuits which considered the *Mitchell* rationale for standing have explicitly rejected this reasoning. See *Holtzman v. Schlesinger,* 484 F.2d 1307, 1315 (2d Cir. 1973); *Harrington v. Schlesinger,* 528 F.2d 455, 459 (4th Cir. 1975).

**89.** The injury may result from "a threat of specific future harm . . .," *Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972).

**90.** *Golden v. Zwickler,* 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969).

age cannot be demonstrated, the standing claim must fail even if the underlying injury is judicially cognizable. In this case, the harm that is alleged will take place at such a time in the future so as to render any potential injury "speculative,"[91] "conjectural"[92] or "remote"[93] in the vocabulary of the standing doctrine.

The "bears upon" language which appellant uses in his allegations related to the first cause of action has a profound effect on the nature of appellant's "personal stake in the outcome of the controversy . . ."[94] Appellant's real interest is in having the question of the legality of certain of the CIA's activities decided *one way or the other.* That is, since the ultimate goal is to obtain a judgment which will produce information that merely "bears upon" his duties, a declaration of *legality* would serve the same purpose in guiding the appellant in his asserted duties. Appellant claims no particular interest in the outcome and it appears that *either* result would serve his asserted need for information bearing upon legislative action relating to the CIA.

 Appellant thus is a bystander as to the result of the controversy. If there is one concept to be gained from the Supreme Court decisions on standing, it is that a litigant, to have standing, must have a *stake* in the controversy at issue, *i. e.*, he himself must perceptibly win or lose depending on the outcome.[95] This aspect of

appellant's case points to the primary vice of the *Mitchell* language. This test lessens the strength of the necessary connection between the complaining party and the controversy which he seeks to have adjudicated, thus undermining the basic policies of the standing doctrine enunciated in *Baker v. Carr*[96] and *Flast v. Cohen.*[97] This weakened relationship between party and controversy has the effect of transforming a complaint for declaratory judgment into a request for an advisory opinion in clear violation of Article III limitations.[98]

 Therefore, we conclude that the "bears upon" language, and the notion it imports,[99] are inconsistent with the constitutional requirement of injury in fact and strike at the foundations of the standing doctrine as developed by the Supreme Court.[100] Just as it is well established that "a mere 'interest in a problem' . . . is not sufficient by itself . . ."[101] for standing, neither is the mere relevance of a challenged activity to an asserted interest sufficient to invoke the power of the federal judiciary.

Appellant repeatedly makes the point that the challenged activities of the CIA are specific in nature and precisely enumerated in the complaint.[102] Appellant apparently believes that such characterizations add that "essential dimension of specificity to the dispute . . ."[103] which is necessary to establish standing. In so doing, appel-

**91.** *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 42–43, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

**92.** *Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

**93.** *O'Shea v. Littleton,* 414 U.S. 488, 498, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

**94.** *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

**95.** See discussion of plaintiff's interests under II.A., *supra.*

**96.** See note 71, *supra.*

**97.** See note 72, *supra.*

**98.** *See, e. g., United States v. Fruehauf,* 365 U.S. 146, 81 S.Ct. 547, 5 L.Ed.2d 476 (1961); *Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

**99.** We emphasize that it is not the *Mitchell* language alone which we disapprove; rather, it is the *relevance standard of injury,* no matter how it is expressed, that is the focus of our concern.

**100.** See notes 71 and 72, *supra.*

**101.** *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).

**102.** See, *e. g.,* Appellant's Brief at 6, 7, 10, 20; Complaint, ¶¶ 11, 12, J.A. at 5a–8a.

**103.** *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 221, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974).

lant misconceives the nature of the specificity requirement of the standing doctrine.[104] Appellant is required to allege that he has suffered specific harm, not that the injury emanates from a very specific source. Although specific activities may indeed be more likely to cause specific injury, this is not necessarily the result, as shown by appellant's failure to establish such a relationship in this case. It is the nature of the injury, and not the source, that is the primary focus of concern when dealing with the question of standing.

▓▓▓ Appellant undoubtedly has interests in his status as a Congressman in the impeachment, appropriations, and general lawmaking powers of the Congress.[105] He has not, however, alleged any "concrete injury, whether actual or threatened, [which] is [the] indispensable element . . ."[106] of a claim for standing. Therefore, appellant has no standing to seek a declaratory judgment that the CIA has engaged in foreign and domestic activities in excess of its statutory authority. We do not hold that a Congressman may never seek a declaratory judgment of Executive illegality, but that such a request must be accompanied by allegations of particular concrete injury as defined by the Supreme Court.[107]

### C. The Second Cause of Action—Use of the CIA Act Concealment Provisions

▓▓▓ The standing claims related to the second cause of action, which focuses on the impact of the alleged misuse of the funding and reporting provisions of the CIA Act on appellant's participation in the legislative process, rest on the assertion of five injuries: (1) the impairment of all prospective votes on appropriations measures; (2) the impairment of appellant's overall effectiveness as a legislator; (3) the impairment of appellant's past votes on appropriations legislation; (4) injury to the special interest in the administration of certain laws; and (5) the harm resulting from the denial of information under 31 U.S.C. § 1029. The first three of these injuries rely on *Kennedy v. Sampson*[108] for support, while the fourth rests solely on appellant's status as a Congressman. The fifth, which relies on *Mitchell v. Laird*,[109] has been disposed of by the analysis in Part III.B., *supra*. We will first examine *Kennedy v. Sampson* to determine if appellant's first three claims of injury are supported by either the holding or the broader language in this case. After showing that *Kennedy* does not support these claims, the asserted injuries will be further tested against the general framework developed by the Supreme Court. Finally, appellant's claim relating to the administration of the CIA Act will be analyzed to determine if a judicially cognizable injury has been stated.

In *Kennedy* a U.S. Senator sought a declaratory judgment that a bill for which he had voted had become validly enacted despite a pocket veto by the President. The Senator claimed that the pocket veto had rendered his vote ineffective and deprived him of his constitutional right to vote on an override of the Presidential veto. The court upheld the Senator's standing as an individual legislator to challenge this executive action. In so doing the court stated that

> [A]ppellee's vote in favor of the bill in question has been nullified and appellee

---

**104.** See text at notes 85–87, *supra.*

**105.** Since we have determined that appellant has not presented any judicially cognizable injury in this case, we need not define these interests or express a view as to the existence or scope of any of the interests put forth by appellant. See note 68, *supra.*

**106.** *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 220, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974).

**107.** It bears repeating that sufficient allegations of injury are but the initial threshold which a plaintiff must meet in order to be granted standing. The additional inquiries outlined in note 68, *supra,* must be posed and answered after the conclusion is drawn that the allegations of injury in fact · are acceptable.

**108.** 167 U.S.App.D.C. 192, 511 F.2d 430 (1974).

**109.** 159 U.S.App.D.C. 344, 488 F.2d 611 (1973).

has no right to demand or participate in a vote to override the President's veto.[110]

Thus, the *Kennedy* case operated in the context of a specific piece of legislation and the individual Senator's relationship to it.

In *Kennedy* the injury to the previously cast vote was the effective disenfranchisement of the legislator with respect to the bill in question. As a result of the asserted illegality, the Senator's vote was rendered a direct and immediate nullity, as if he had not cast the vote at all. Appellant claims no such nullification of his past votes in this case; there is no claim that the past votes were denied full force and effect as the result of the CIA activities in question. The court's inquiry in *Kennedy* was limited to a discrete aspect of the process by which a bill becomes law (the actual vote on the legislation) and those post-enactment events denying the bill's status as law; the inquiry did not extend to the interpretation of a concededly valid law as appellant would have us do in this case. The *Kennedy* paradigm thus relies on nullification of a specific vote as the requisite injury in fact; appellant in this case puts forth a quite different proposition and therefore cannot employ the *Kennedy* precedent in these circumstances. This conclusion does not in itself foreclose the existence of injury in fact; rather, any injury possibly suffered by appellant is not of the variety recognized in *Kennedy*.

Appellant believes that the concern expressed in *Kennedy* relating to the withdrawal of the opportunity to vote on the override of the President's veto supports his asserted injury to all future votes on appropriations measures. It is true that in both instances the votes are to take place in the future, but the similarity does not extend beyond this analytically superficial proposition. With respect to the enactment of a specific piece of legislation, the legislative process consists of a continuum of events which culminates in the legislation either becoming a validly enacted law or being vetoed by the Executive. In the case of a Presidential veto, an additional step is provided *in the Constitution* in the form of a Congressional right to override.[111] If this step is employed, it merely becomes another event in the same legislative continuum which began when the legislation was first introduced. The override scheme is thus not another totally independent process in itself, but is tied directly to the same discrete factual context relating to the legislation already passed and submitted to the President. Thus, the concern expressed in *Kennedy* over injury to a future vote is quite limited, since the future vote in question was a constitutionally prescribed followup to the vote already cast on the same precise legislative bill. In this case appellant draws no such connection between his past and future votes but relies on an impairment of future unspecified votes standing alone. The nature of the impairment asserted in *Kennedy* was the complete withdrawal of the opportunity to cast the future vote; appellant in this case relies on uncertainty due to the lack of information as the injury to his future votes. Thus, once again appellant has posited a quite different case from that presented in *Kennedy*.

Appellant's arguments relating to the injury to his effectiveness as a legislator derive from repeated references to this notion in the *Kennedy* case.[112] In *Kennedy* the court stated that the ". . . disposition of the substantive issue will determine the effectiveness *vel non* of appellee's actions as a legislator *with respect to the legislation in question*. . ."[113] In referring to "appellee's actions as a legislator," the court was focusing on the Senator's vote on the bill in question; the court was not expressing a

---

110. 167 U.S.App.D.C. 192, 195, 511 F.2d 430, 433 (1974).

111. Article I; Section 7, Clause 2.

112. 167 U.S.App.D.C. 192, 195, 197, 198, 511 F.2d 430, 433, 435, 436 (1974).

113. *Id.* at 195, 511 F.2d at 433 (emphasis added). The court in *Kennedy* relied on language in *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), with respect to the concern for effectiveness ("We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes," 307 U.S. 438, 59 S.Ct. 975).

concern with the generalized, amorphous, overall effectiveness of the Senator's participation in the legislative process. As with the other concerns in the case, the effectiveness language was narrowly focused in *Kennedy* on a specific legislative action. Appellant in this case seeks to expand this definition of effectiveness to other aspects of the legislative process,[114] again distinguishing his case from the reasoning accepted in *Kennedy.*

With respect to the effectiveness rationale the court in *Kennedy* also stated that "appellee's stake in this litigation is a quantum of his *official* influence upon the legislative process."[115] It is important to put this broad language into proper context with two observations. First, the court is again referring to a specific vote on a specific piece of legislation; it is *not* a reference to the general legislative process and all of its facets.[116] Second, and more importantly, the court has by this choice of language properly adopted an objective standard for determining when judicially cognizable injury has taken place. This objective standard is to be found in reference to "official influence"; the nature of this influence is determined by the Constitution, statutes, and rules and practices of the two houses of Congress and not by an individual legislator's conception. As noted previously, appellant has presented a subjective standard by which to judge his effectiveness and any injury thereto.

In summary, the *Kennedy* case presented its effectiveness rationale in terms of objective injury to the legislator's vote on a particular bill; the appellant in this case, however, asserts subjective injury to his overall effectiveness which flows from his lack of information concerning the CIA. Having determined that the *Kennedy* case cannot be read to include the three interests discussed above, it is now appropriate to test these interests against the broader framework of the standing doctrine.

As to appellant's claims that his future votes on appropriations measures are impaired, we hold that there has been no judicially cognizable injury stated. The hallmark of the funding and reporting provisions of the CIA Act is uncertainty; appellant has not refined this concept in his submissions to this court so as to distinguish between acceptable and unacceptable uncertainty. There has been no specific link drawn between the assumed illegal activities of the Agency and future votes. There has been no allegation that appellant's vote will be nullified by the activities or that appellant will be personally disenfranchised in any respect. The potential misuse of funds by a recipient is always a possibility when Congress appropriates money; in this case, appellant has the advantage of access to public acknowledgements which he believes to violate the CIA Act. But he has not drawn the necessary connection between these activities and his interests in the appropriations process to assure us of the "concrete adverseness"[117] which is the concern of the standing doctrine. In *Kennedy* this concreteness was assured because of the direct nullification of the Senator's vote; here the illegality has not been traced into a "discrete factual context in which . . . concrete injury [has] occurred or is threatened,"[118] and any injury remains speculative and remote.[119]

**114.** Appellant seeks to read the *Kennedy* case very broadly as holding that "an individual legislator may have standing in appropriate circumstances to challenge Executive actions which impair the legislative process," Appellant's Brief at 19. Appellant also states that the *Kennedy* case dealt with the "effectiveness of the plaintiff's functioning as a legislator." *Id.* at 20. Appellant's belief that the *Kennedy* case dealt with the general legislative process is mistaken.

**115.** 167 U.S.App.D.C. 192, 198, 511 F.2d 430, 436 (1974) (emphasis added).

**116.** See notes 110, 114, *supra.*

**117.** *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

**118.** *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 2933, 41 L.Ed.2d 706 (1974).

**119.** *See O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

With respect to the impairment of votes already cast, we draw the same conclusion that there is no injury in fact to this interest to be found in appellant's allegations. The assumed illegal Agency activities and the misuse of the funding and reporting provisions do not affect the legal status of the appropriations bills for which appellant has voted. The abuse of delegated authority does not invade the lawmaking power of Congress or appellant; all the traditional alternatives related to the "power of the purse" remain intact.[120] Appellant's votes have not been nullified or diminished in force because of the post-enactment illegality. It may be true that, upon learning that the CIA has engaged in activities which he believes to be illegal, appellant may feel that he has been severely injured when casting his votes or that he would have cast his vote differently. Such feelings of injury are subjective in nature; from an objective standpoint, his "official influence" has not been diminished by the allegedly illegal activities.

The same subjectivity that undermines appellant's claims of injury to specific past votes is also present in his argument that his overall effectiveness has been impaired. To constitute injury in fact, the alleged harm must be "specific . . . and objective";[121] appellant's claims regarding effectiveness are neither. Appellant is, from an objective vantage, as effective a legislator as any of his colleagues, fully able to exercise all rights granted to him by the Constitution, statutes, and House rules and practices. The allegedly illegal activities of the CIA have not diminished this effectiveness. The legislative prerogatives of Congress and the appellant have not been frustrated by the Agency activities. Since appellant has failed to show injury to his effectiveness as a Congressman, he has no right to invoke the power of the federal judiciary.

There remains but one interest of the appellant to analyze. This interest concerns appellant's assertion of a "special relationship" to the legislative process which confers on him an interest in the proper administration of the laws. Appellant is a Congressman; his specific rights, interests and prerogatives lie in the power to make laws. As we have noted, this power has not been invaded, diminished, diluted, or injured by the challenged actions in this case. Once a bill becomes law, any injury which is inflicted by its operation would seem to fall equally on all citizens. Thus, appellant's claim in this regard fails for two reasons. First, although appellant has an interest in the proper administration of the laws, this interest does not arise directly from his status as a Congressman; consequently, there is no "logical nexus between the status asserted and the claim sought to be adjudicated."[122] Second, since the impact

120. See note 41, *supra.*

121. *Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

122. *Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 1947 (1968). It will be noted that we make no reference in note 68, *supra,* to this often-quoted statement as a separate inquiry or test to be applied in the analysis of standing questions. In *Flast,* after first determining that there is "no absolute bar in Article III to suits by federal taxpayers . . . .," 392 U.S. 101, 88 S.Ct. 1953, the Supreme Court turned its attention to

the problem of determining the circumstances under which a federal taxpayer will be deemed to have the personal stake and interest that impart the necessary concrete adverseness to such litigation so that standing can be conferred on the taxpayer *qua* taxpayer consistent with the constitutional limitations of Article III.

*Id.* The nexus test was developed as a technique for analyzing this problem; the nexus inquiry did not in any way alter the basic notions underlying the standing doctrine.

The nexus test has generated considerable analytical confusion since *Flast.* The primary difficulty lies in determining the precise focus of the test; it can easily be read as dealing solely with the question of injury, or solely with the nature of the interest asserted, or a combination of the two. The necessity for a precise focus derives from the fact that the injury requirement is a constitutional requirement, unlike the other inquiries. As Mr. Jus-

of the illegality is shared by all citizens, appellant's complaint about the administration of the CIA Act becomes a "generalized grievance about the conduct of government"[123] which lacks the specificity to support a claim of standing. There is no doubt that, as a Congressman, appellant occupies a special relationship to the legislative process. This relationship, however, merely defines his power to act in the process, not the impact of any illegality on his Congressional status. Thus, we conclude that, with respect to appellant's "special relationship" argument, any injury which flows from abuse of delegated authority by the CIA inflicts no injury on appellant as a Congressman.

In addition to the absence of demonstrable injury, appellant has directed his complaint of alleged injury at the wrong source. The only restraints on appellant Member's legislative activities concerning the CIA are those imposed by the House of Representatives through its own rules; yet appellant has sued, not the House, but only officers of the Executive Branch.

██ Art. I, § 5, cl. 2 of the Constitution provides that "[e]ach House may determine the rules of its proceedings." This provision gives a specific constitutional base—a constitutional status, if you prefer—to the rules that Congress provides for its own proceedings. In deference to the fundamental constitutional principle of separation of powers, the judiciary must take special care to avoid intruding into a constitu-

tionally delineated prerogative of the Legislative Branch.[124] What appellant would have us do here is to intervene on behalf of one member of the Legislative Branch to change "the rules of its proceedings" adopted by the entire body of the House. This we should not do.

## IV. CONCLUSION

As a conclusion to our analysis of appellant's Congressional standing claims in this case, it is worthwhile to consider the implications of a grant of standing on the grounds which appellant has set forth. That is, if appellant were allowed to rely on the *Mitchell* standard, or solely on institutional injury, or on the type of subjective, speculative injury asserted, what would be the consequences? To accept these grounds for standing would in effect allow *any* Congressional suit to challenge Executive action, and an individual legislator would have a roving commission to obtain judicial relief under most circumstances. This would lead inevitably to the intrusion of the courts into the proper affairs of the co-equal branches of government. Indeed, at oral argument appellant asserted that he wished this court to declare what is "the proper legislative process" with respect to the laws regulating the CIA. This bold and totally unacceptable assertion serves to highlight the separation of powers problems inherent in suits brought by individual members of the legislative branch.

tice Powell stated, "I find it impossible . . to determine whether the two-part 'nexus' test created in *Flast* amounts to a constitutional or a prudential limitation . . .," *United States v. Richardson,* 418 U.S. 166, 181, 94 S.Ct. 2940, 2948, 41 L.Ed.2d 678 (1974) (Powell, J., concurring). Mr. Justice Brennan has also criticized the nexus test, believing that "[t]he extension of [the nexus] test to . . . very different challenges . . . only produces . . . confusion," *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 238, 94 S.Ct. 2925, 2963, 41 L.Ed.2d 706 (1974) (Brennan, J., dissenting). The nexus statement does, in limited circumstances such as this note, serve as a useful description of the status of a litigant. It is not, however, a separate, all-encompassing test. An avowed purpose of the *Flast* opinion was to clarify many aspects of the previously confused

law of standing, 392 U.S. 92–93, 88 S.Ct. 1942. Although this goal may or may not have been accomplished, the *Flast* opinion did not succeed in laying down a comprehensive, analytically consistent test for the future. The many standing cases since *Flast* have refined and further delineated the various elements of the standing doctrine, and it is from these cases that we draw the four inquiries outlined in note 68, *supra.* These inquiries serve to focus a court's inquiry more precisely, more systematically, and more comprehensively than the *Flast* nexus test and will therefore be employed in our analysis.

**123.** *Id.* at 106, 88 S.Ct. at 1956.

**124.** See note 7, *supra.*

 We are mindful of the Supreme Court's statement in *Flast v. Cohen* that the question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government. Such problems arise, if at all, only from the substantive issues the individual seeks to have adjudicated.[125]

Although separation of powers issues may be *more* closely tied to the political question doctrine than to standing,[126] we believe it is appropriate to take note of these concerns in this context.[127] As the Supreme Court stated in *Warth v. Seldin,* the standing doctrine "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." [128] Since the appellant in this case has suffered no injury in a constitutional sense, he is in effect seeking to use the court to vindicate his own political values and preferences. By so doing, appellant is asking us in large part to usurp the legislative function and to grant him the relief which his colleagues have refused him. We note that we have given all of appellant's asserted injuries careful attention and that none of these meet the requirements established by the Supreme Court. Were we to accept these injuries as sufficient to invoke the exercise of our jurisdiction, in the language of the Chief Justice we "would create the potential for abuse of the judicial process [and] distort the role of the Judiciary in its relationship to the Executive and Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.' " [129] Although we do not rest our denial of standing on these separation of powers grounds, their existence does point to the need for a *very clear* showing of concrete, personal injury in this type of case so that federal courts will not be thrust into the role of "continuing monitors of the wisdom and soundness of Executive action. . . ." [130]

*Affirmed.*

---

**125.** *Flast v. Cohen,* 392 U.S. 83, 100–01, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

**126.** *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

**127.** *See United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 2933, 41 L.Ed.2d 706 (1974).

**128.** 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

**129.** *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 2933, 41 L.Ed.2d 706 (1974).

**130.** *Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972).