**Senator Barry GOLDWATER et al., Plaintiffs,**

**v.**

**James Earl CARTER et al., Defendants.**

**Civ. A. No. 78–2412.**

United States District Court,
District of Columbia.

Oct. 17, 1979.

---

1. See *Nelms v. Gardner, supra; Celebrezze v. Warren,* 339 F.2d 833, 836 (10th Cir. 1964); *Brittingham v. Weinberger, supra.*

Daniel J. Popeo, Paul D. Kamenar, Robert F. Pietrowski, Jr., and J. Terry Emerson, Washington, D.C., for plaintiffs.

David J. Anderson, Catherine A. Ribnick and Steve F. Brault; Trial Attys., U. S. Dept. of Justice, Civ. Div., Washington, D.C., Mark B. Feldman, Deputy Legal Adviser, Arthur W. Rovine, Asst. Legal Adviser, Dept. of State, Washington, D.C., for defendants.

## MEMORANDUM

GASCH, District Judge.

Before the Court is plaintiffs' motion under Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend the Court's judgment in this case of June 6, 1979. This suit was brought by eight members of the United States Senate, a former senator, and sixteen members of the House of Representatives seeking declaratory and injunctive relief against the notice given by defendant President Carter to the Republic of China ("ROC" or "Taiwan") to terminate the 1954 Mutual Defense Treaty Between the United States of America and the Republic of China. Plaintiffs seek to have this Court declare that the termination of the 1954 Treaty cannot be legally accomplished, nor can notice be given of intended termination, without the advice and consent of the United States Senate or the approval of both houses of Congress. Plaintiffs contend that President Carter's unilateral notice of termination violated their legislative right to be consulted and to vote on the termination and also impaired the effectiveness of prior votes approving the 1954 Mutual Defense Treaty.

■ By Memorandum-Order dated June 6, 1979, the Court dismissed plaintiffs' complaint without prejudice on the ground that plaintiffs lacked standing. Under the circumstances then presented, the Court believed that plaintiffs had not suffered the requisite injury in fact to support standing. The Court now concludes, for the reasons set forth in Part II A of this Memorandum, that all plaintiffs with the exception of former Senator Curtis[1] have suffered and are suffering a present judicially cognizable injury in their capacity as individual legislators. Accordingly, the Court hereby alters and amends its judgment of June 6, 1979 to hold that these plaintiffs have standing to seek a judicial declaration with respect to the constitutionality of the President's unilateral termination of the 1954 Treaty. The Court further concludes, for the reasons set forth in Part II B, that this case does not present a nonjusticiable political question, and thus the issue of treaty termination should be decided on the merits.

For the reasons set forth in Part III of this Memorandum, the Court holds that the termination of the 1954 Mutual Defense Treaty Between the United States of Amer-

---

1. The Court continues to reject the particular standing claims of plaintiffs Thurmond and Curtis that are grounded on the allegation that the President's action has impaired the effectiveness of their prior votes approving the 1954 Treaty. An interest in ensuring enforcement or the proper administration of laws for which a legislator has voted is insufficient to confer standing. *See Harrington v. Bush*, 180 U.S. App.D.C. 45, 68–69, 553 F.2d 190, 213–14 (D.C. Cir. 1977); *Harrington v. Schlesinger*, 528 F.2d 455, 459 (4th Cir.1975). All plaintiffs other than former Senator Curtis also claim an injury to their legislative right to be consulted and to vote on treaty termination, and it is this injury that the Court now finds sufficient to support standing.

ica and the Republic of China cannot be constitutionally accomplished without the advice and consent of the United States Senate or the approval of both houses of Congress.

### I.

A full discussion of the events leading up to the present diplomatic situation is contained in the Court's Memorandum-Order of June 6, 1979, and is incorporated herein by reference. The essential dispute concerns the constitutional validity of President Carter's unilateral notice of termination of the Mutual Defense Treaty, given on December 23, 1978 through the United States Deputy Secretary of State, Warren Christopher. According to the notice, the termination will be effective January 1, 1980 pursuant to the termination clause contained in Article X of the treaty.[2] The President has not submitted, for the purpose of obtaining legislative concurrence, the notice of termination to either the Senate or the Congress as a whole.[3] Instead the President maintains, and has continued to maintain, that he possesses the unilateral authority under the Constitution to terminate the Mutual Defense Treaty with the Republic of China.

### II.

Before reaching the merits of that constitutional question, however, it remains necessary to resolve the threshold issues of standing and political question, which are subsumed within the concept of justiciability. These inquiries become particularly sensitive in the context of a suit by Senators and Congressmen seeking to challenge executive action, because of the accompanying political overtones and separation of powers concerns. Although in this context, standing to sue and the political question doctrine are interrelated to a large degree, the Court, as it did in its earlier opinion, believes it appropriate to address the standing issue first.[4]

### A. Standing.

In moving this Court for an order to alter or amend its judgment of June 6, plaintiffs contend that the requirements for injury in fact expressed in the Court's earlier opinion have been satisfied and that they now have standing to assert their derivative constitutional rights.

It has been noted that no special standards govern congressional standing questions. As articulated by the Court of Appeals for the District of Columbia Circuit, a legislator must satisfy the same basic requirements for standing as any other litigant: (1) that he has suffered injury in fact; (2) that the interests being asserted are within the zone of interests to be protected by the statute or constitutional guarantee in question; (3) that the injury is caused by the challenged action; and (4) that the injury is capable of being redressed by a favorable decision. *Harrington v. Bush*, 180 U.S.App.D.C. 45, 59, 60, 553 F.2d 190, 204, 205 n. 68 (D.C. Cir. 1977). At issue here is the existence of injury in fact, a constitutionally mandated requirement inherent in the Article III "case or controversy" limitation on federal judicial power. *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

The Court of Appeals, beginning with its important decision in *Kennedy v. Sampson*,[5]

---

2. Article X of the treaty contains a termination clause which states that the treaty "shall remain in force indefinitely," but continues: "Either party may terminate it one year after notice has been given to the other party."

3. Had this been done under Senate Rules VII and XXVIII the President's message would have been given priority. Deferential attention in the Senate where both the Majority leader and the chairman of the Senate Foreign Rela-

tions Committee support the President's position would be expected.

4. *See Reuss v. Balles*, 189 U.S.App.D.C. 303, 307, 584 F.2d 461, 465 n. 14 (D.C. Cir.), *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Harrington v. Bush*, 180 U.S.App. D.C. 45, 49, 553 F.2d 190, 194 n. 6 (D.C. Cir. 1977).

5. 167 U.S.App.D.C. 192, 511 F.2d 430 (D.C. Cir. 1974). In *Kennedy*, the Court held that the

has developed a comprehensive body of law setting forth an analytical framework for approaching cases involving congressional standing. The theory of standing established in *Kennedy* is one of derivative injury, based upon the right of each individual legislator to participate in the exercise of the powers of the institution.[6] This concept of derivative institutional injury requires a plaintiff Congressman to show, first, an injury in fact to the institution of Congress, and, second, that as an individual legislator he has been injured in fact because of the harm done to the institution. *Harrington v. Bush*, 180 U.S.App.D.C. 45, 54, 553 F.2d 190, 199 n. 41 (D.C. Cir. 1977). The institutional injury alleged by plaintiffs here is that President Carter's unilateral notice of termination of the 1954 Treaty has violated the constitutional right of Congress to be consulted and to vote on that termination.[7] Under the circumstances present at the time of the Court's June 6 decision, the Court could not discern the existence of a definite and concrete institutional injury, and thus held that the individual legislators could not claim a derivative injury to their participatory rights. In large part this was due to what the Court perceived as a substantial likelihood of resolution of the treaty termination issue through the legislative process and the Court's reluctance to interfere with a potential political solution.

The question of the availability of alternative political remedies to redress executive action is indeed another dimension underlying the congressional standing cases and the insistence on a clear showing of injury in fact.[8] It is in this context that the prudential and functional concerns expressed by the Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the leading statement on the political question doctrine, interrelates with the analysis of congressional standing. Both reflect the deference to be accorded a coordinate branch of government under our system of separation of powers.[9] Hence, courts are justifiably concerned when a suit by individual legislators seeks to vindicate derivative rights susceptible to being adequately redressed in the political arena.

The potential availability of a remedy through the legislative process, however, is not conclusive on the question of injury in fact and thus certainly not fatal to a legislator's standing claim. *Metcalf v. National Petroleum Council*, 180 U.S.App.D.C. 31, 44, 553 F.2d 176, 189 n. 129 (D.C. Cir. 1977); *see Reuss v. Balles*, 189 U.S.App.D.C. 303, 310, 584 F.2d 461, 468 (D.C. Cir.), *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Kennedy v. Sampson*, 167 U.S.App. D.C. 192, 197, 511 F.2d 430, 435 n. 17 (D.C. Cir. 1974). Rather, in deference to the fun-

---

plaintiff Senator had standing to seek a declaratory judgment that a bill for which he had voted had become law despite a presidential pocket veto. The Senator's vote in favor of the bill and his constitutional right to participate in a vote to override the veto had been nullified by the executive action.

**6.** *Id.* 167 U.S.App.D.C. at 197–198, 511 F.2d at 435–36.

**7.** In *Kennedy v. Sampson*, the nullification of a specific constitutionally prescribed vote was sufficient to constitute injury in fact. *Id.* 167 U.S.App.D.C. at 198, 511 F.2d at 436. *See Harrington v. Bush*, 180 U.S.App.D.C. 45, 67, 553 F.2d 190, 211 (D.C. Cir. 1977). The impairment of other rights of Congress conferred by the Constitution may also serve as a basis for standing under the participatory rights analysis of *Kennedy*. *See* Note, *Congressional Access to the Federal Courts*, 90 Harv.L.Rev. 1632, 1641 (1977). The right to participate in the

treaty termination process would constitute such a right.

**8.** *See Reuss v. Balles*, 189 U.S.App.D.C. 303, 310, 584 F.2d 461, 468 (D.C. Cir.), *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Harrington v. Bush*, 180 U.S.App.D.C. 45, 70, 553 F.2d 190, 215 (D.C. Cir. 1977); *Metcalf v. National Petroleum Council*, 180 U.S.App.D.C. 31, 44, 553 F.2d 176, 189 & n. 129 (D.C. Cir. 1977); *Harrington v. Schlesinger*, 528 F.2d 455, 459 (4th Cir. 1975); *Public Citizen v. Sampson*, 379 F.Supp. 662 (D.D.C.1974), *aff'd mem.*, 169 U.S.App.D.C. 301, 515 F.2d 1018 (D.C. Cir. 1975).

**9.** *See Reuss v. Balles*, 189 U.S.App.D.C. 303, 307, 584 F.2d 461, 465 n. 14 (D.C. Cir.), *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Harrington v. Bush*, 180 U.S.App. D.C. 45, 70, 553 F.2d 190, 215 (D.C. Cir. 1977); Note, *Congressional Access to the Federal Courts*, 90 Harv.L.Rev. 1632, 1643-52 (1977).

damental constitutional principle of separation of powers and in order to avoid abuse of the judicial process, the Court must require a clear showing of injury in fact. In each case where a denial of standing has been based in part on the existence of alternative political remedies, there was no impediment to the legislative process whatsoever and the powers of the plaintiff Congressmen remained rather clearly undiminished.[10] In those instances, there was a genuine risk that granting standing could have the effect of interfering with or circumventing the legislative process, and thus provide judicial redress for Congressmen who had simply failed to take advantage of, or to succeed in persuading their colleagues to take advantage of, an expedient opportunity for legislative action. The Court is convinced that this suit is distinguishable,

given the present legislative posture and the nature of the derivative injury claimed.

At the time of the Court's June 6 decision, at least three resolutions dealing with the treaty termination power and the notice of termination given with respect to the 1954 Mutual Defense Treaty were then pending before, and apparently being actively considered by, the United States Senate.[11] The Court was especially concerned that a premature judicial declaration might circumvent legislative action directed at either approving or rejecting the President's notice of termination. Believing that the resolution of the ultimate issue of treaty termination authority in this case should in the first instance be in the legislative forum, the Court stated that its judicial powers should be exercised only after the legislative branch had been given the opportuni-

---

10. Thus in *Public Citizen v. Sampson*, 379 F.Supp. 662 (D.D.C.1974), *aff'd mem.*, 169 U.S. App.D.C. 301, 515 F.2d 1018 (D.C. Cir. 1975), a group of 17 Congressmen challenged a General Services Administration regulation authorizing agencies to grant exclusive rights to patents developed under federal research contracts. The Court found no injury in fact and denied standing because promulgation of the regulation could not deprive Congress of its "uncontested right and power" to dispose of government property by proposing legislation regulating the contractual authority of GSA. The powers of the plaintiff Congressmen in that case were not diminished in any respect.

Comparable factual situations were posed in *Metcalf v. National Petroleum Council*, 180 U.S.App.D.C. 31, 553 F.2d 176 (D.C. Cir. 1977), and *Harrington v. Bush*, 180 U.S.App.D.C. 45, 553 F.2d 190 (D.C. Cir. 1977). In *Metcalf*, the plaintiff Senator alleged that the NPC and its subgroups were unlawfully functioning as advisory committees in violation of the Federal Advisory Committee Act and the Federal Energy Administration Act. Standing was denied partly on the basis that plaintiff's power to act in his role as legislator and Subcommittee chairman to acquire accurate, unbiased information was completely intact. 180 U.S.App. D.C. at 44, 553 F.2d at 189. In *Harrington*, a Congressman sued for a declaration that certain CIA activities were in excess of the agency's statutory authority, and an injunction prohibiting the CIA from using the funding and reporting provisions of the CIA Act of 1949 in connection with those illegal activities. The Court again denied standing, noting that the legislative process regarding the power to prescribe CIA activities remained unimpeded, and

that plaintiff to a large extent was attempting to get more information concerning CIA funding than the Congress wished him to have. 180 U.S.App.D.C. at 54, 56, 69–70, 553 F.2d at 199 n. 41, 201 n. 50, 214–15.

Finally, in *Reuss v. Balles*, 189 U.S.App.D.C. 303, 584 F.2d 461 (D.C. Cir.), *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978), the Court of Appeals again appeared to base its denial of standing in part on the existence of an alternative political remedy. In that case a Congressman sought declaratory and injunctive relief alleging that 12 U.S.C. § 263(a) provided for an unconstitutional composition of the Federal Open Market Committee of the Federal Reserve System in violation of the Appointments Clause of the Constitution. In rejecting plaintiff's theory of legislator standing, the Court noted that the Congressman could simply introduce a bill requiring all FOMC members to be presidential appointees, and thus that "no supposed impairment of his legislative functions [was] due, in any part, to the actions or omissions of the named defendants." 189 U.S.App.D.C. at 310, 584 F.2d at 468. *See also Harrington v. Schlesinger*, 528 F.2d 455, 459 (4th Cir. 1975) (holding that plaintiff Congressman lacked standing to challenge military expenditures as violative of statutes limiting United States involvement in Southeast Asia because of the available legislative solution of tightening the statutory restrictions).

11. Memorandum Opinion of June 6, 1979, at 9 n. 13. Additionally there was a commitment by the Senate leadership that Resolution 15 would be considered not later than June 8th. 125 Cong.Rec. S2297 -S2305 (March 8, 1979).

ty of acting.[12] At that time there was no indication whether the Senate or the Congress as a whole intended to assert a right to participate in the treaty termination process, nor whether the action likely to be taken would be such that a judicial declaration would interfere with it.

The legislative branch has now had further opportunity to act. On June 6, 1979, within hours after the Court's initial ruling in this case, the United States Senate voted 59 to 35 to adopt an amendment proposed by Senator Harry F. Byrd, containing language identical to original Senate Resolution 15,[13] as a substitute for the substitute amendment[14] proposed by the Senate Foreign Relations Committee. 125 Cong.Rec. S7038–7039 (June 6, 1979). The language adopted by the Senate vote reads as follows:

> That it is the sense of the Senate that approval of the United States Senate is required to terminate any mutual defense treaty between the United States and another nation.

125 Cong.Rec. S7015. Subsequent to that vote, additional amendments were proposed by Senator Church, Chairman of the Foreign Relations Committee, and by Senator Goldwater, a plaintiff in this action.[15] Neither amendment came up for a vote, and Senate Resolution 15 as amended by Senator Harry F. Byrd's language has been returned to the Senate calendar without further action. The vote in favor of the Byrd amendment does not constitute final action by the Senate,[16] although it stands as the last expression of Senate position on its constitutional role in the treaty termination process. By that vote, the Senate rejected a Committee substitute that would have expressly approved of the action taken by the President in terminating this treaty.[17] No further steps have been taken by the Senate with respect to treaty termination powers.

The action taken by the Senate has admittedly not been decisive. It does, however, evidence at least some congressional determination to participate in the process whereby a mutual defense treaty is terminated, and clearly falls short of approving the President's termination effort.[18] At the

---

12. Memorandum Opinion of June 6, 1979, at 11.

13. Senate Resolution 15 was introduced by Senator Harry F. Byrd on January 18, 1979. 125 Cong.Rec. S220.

14. The Senate Foreign Relations Committee, on May 1, reported Resolution 15 with an amendment to strike all after the resolving clause and insert substitute language providing several grounds for unilateral Presidential terminations of treaties. 125 Cong.Rec. S5018. It was this substitute Committee amendment that was displaced by the Byrd amendment on June 6.

15. The Church amendment would add the following language:
> The provisions of this Resolution shall not apply with respect to any treaty the notice of termination of which was transmitted prior to the date of adoption of this Resolution.
125 Cong.Rec. S7061 (June 6, 1979). The Goldwater amendment would add the following language:
> (1) The provisions of this resolution shall not be construed to approve or disapprove of the proposed termination of the Mutual Defense Treaty with the Republic of China, such proposed termination not having been submitted to the Senate or the Congress for approval

prior to the date of adoption of this resolution.
> (2) Nor shall anything in this resolution reduce or prejudice any of the Constitutional powers of the Senate.
125 Cong.Rec. S7861–62 (June 18, 1979).

16. See Declaration of Murray Zweben, Parliamentarian of the Senate, dated June 29, 1979, submitted in support of Defendants' Opposition to Plaintiffs' Motion to Alter or Amend the Judgment of June 6, 1979.

17. One of the grounds for unilateral Presidential treaty termination provided in the Committee substitute was "where . . . provisions of the treaty itself, give rise to a right of termination or suspension on the part of the United States . . . ." 125 Cong.Rec. S7014 (June 6, 1979). Article X of the 1954 Mutual Defense Treaty contains a termination clause giving either party the right to terminate one year after notice. See note 2, supra.

18. The Court continues to reject defendants' suggestion that the enactment of the Taiwan Relations Act, Pub.L.No.96–8, 93 Stat. 14 (April 10, 1979), can be interpreted as legislative ratification of the notice of termination. See Memorandum Opinion of June 6, 1979, at 9 n. 14.

same time, as was true in *Kennedy v. Sampson*, Congress has given no indication that it disapproves of the individual suits, and there appears to be no action presently planned with which a judicial declaration would interfere.[19] It must be emphasized, moreover, that when President Carter gave notice to terminate the Mutual Defense Treaty without submitting it for congressional approval, effective legislative participation was delayed and became more difficult in light of that action.[20] Indeed, it can be argued that the theoretical ability of Congress to pursue an alternative political remedy through affirmative legislative action in these circumstances is not necessarily relevant to an analysis of injury in fact to a protected constitutional right, since the Constitution already limits the power of a coordinate branch to act in a particular area.[21] Without adopting the latter position, it certainly can be said that, by the President's unilateral action, the matter of the treaty termination became less amenable to congressional control than the matters involved in other cases presenting the availability of legislative solutions.[22]

It is in this vein that plaintiffs' efforts at pursuing an alternative political remedy, and the danger of the Court's preempting that remedy, must be viewed. Though any such assessment is certainly problematic in the context of relative congressional inaction, in this instance the Court is convinced that there is no apparent risk of circumventing or evading the legislative process by a decision on the merits. The Court therefore concludes that plaintiffs have suffered and are suffering injury in fact to their legislative right to be consulted and to vote on the termination of the 1954 Mutual Defense Treaty. Defendants do not challenge, and indeed there can be no serious dispute, that plaintiffs meet the remaining three requirements of standing relating to zone of interests, causation, and redressability.[23] Thus, plaintiffs satisfy the criteria

19. *See* Note, *Congressional Access to the Federal Courts*, 90 Harv.L.Rev. 1632, 1650–51. *See also Pressler v. Simon*, 428 F.Supp. 302, 304 (D.D.C.1976) (three judge court), *aff'd mem. sub nom. Pressler v. Blumenthal*, 434 U.S. 1028, 98 S.Ct. 758, 54 L.Ed.2d 776 (1978).

20. In each of the four instances where Presidents have initiated the termination process and then requested authority from Congress to terminate treaties, Congress has responded promptly to authorize completion of the termination process. President Taft received legislative ratification and approval to terminate a commercial treaty with Russia three days after his request came to the Senate. 37 Stat. 627. President Wilson on May 17, 1920 sought the "advice and consent" of the Senate to withdraw from the International Sanitary Convention. On May 26, 1921 two-thirds of the Senate present resolved to advise and consent to the denunciation of the convention. 61 Cong.Rec. 1793–1794. President Polk sought authority to terminate the Convention on Boundaries with Great Britain concerning the Oregon Territory. By joint resolution such action was authorized by Congress in less than five months. 9 Stat. 109–110. President Pierce requested authority to give notice to Denmark of the termination of a commercial treaty. Within four months the Senate unanimously gave the requested authority. S.Res. of March 3, 1855, 33d Cong., 2d Sess.; 9 Sen. Executive Journal 431. The Court assumes that a request by the President in the instant case would have been met

with similar deferential attention. *See* note 3 *supra*. The record discloses that, prior to President Carter's delivery of the notice of termination, Senator Goldwater and Senate Minority Leader Baker sought to have the President call a special session of Congress to allow for legislative participation. *See* Plaintiffs' Supplementary Memorandum on the Privileged Status in Congress of Presidential Messages, Exhibits 2–5.

21. *See* Note, *Congressional Access to the Federal Courts*, 90 Harv.L.Rev. 1632, 1642 (1977).

22. *See* note 10, *supra*.

23. Clearly, the denial of plaintiffs' participatory role in the treaty termination process is "within the zone of interests to be protected or regulated by the . . . constitutional guarantee in question." *Ass'n of Data Processing Serv. Organization, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). In addition, it is the President's purported termination of the Treaty, without submitting the notice of termination for congressional approval, from which the denial of plaintiffs' role can be fairly traced. *See Simon v. Eastern Ky. Welfare Rights Organ.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Finally, a judicial decision declaring the constitutional requirements for terminating the Treaty can afford plaintiffs the precise relief requested, and thus the injury is one "likely to be redressed by a

for standing to sue in their capacity as individual legislators. Hence, unless plaintiffs have presented a nonjusticiable political question, the Court may decide the case on the merits.

### B. *Political Question Doctrine.*

■ Defendants contend that even if plaintiffs have standing, they are not entitled to a judgment on the merits because this case presents a nonjusticiable political question. The political question doctrine reflects the view that under our governmental system of separation of powers some issues are not to be resolved by the judiciary but by one of the political branches of the government. Consequently, if a true political question comes before the courts for adjudication, it should be dismissed as nonjusticiable.

Political questions traditionally have been defined as those issues that have been committed by the text of the Constitution, either explicitly or by reasonable inference, to the autonomous control of a coordinate branch.[24] The textual commitment test is indeed an important aspect of the political question doctrine,[25] although other prudential and functional concerns also characterize this flexible restraint on judicial power. In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court stated that on the surface of any case held to involve a political question was at least one of the following formulations:

a textually demonstrable constitutional commitment of the issue to a coordinate

political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. at 710. Defendants contend that several of these formulations, including a textually demonstrable constitutional commitment to the Executive, are inextricable from the case at bar.

Cases involving the foreign relations of the United States are commonly cited as examples of judicial abstention because the issues presented were political questions.[26] For example, courts have considered themselves bound by the Executive's determination regarding which political group represents the government of a foreign state,[27] which nation has sovereignty over disputed territory,[28] and whether certain aliens should be deported.[29] But as the Supreme Court noted in *Baker v. Carr*, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." [30]

Certainly, it is clear that the conduct of the foreign relations of the United States is

---

favorable decision." *Id.* at 38, 96 S.Ct. at 1924. The critical requirement to be satisfied by the congressional plaintiffs here is that they have suffered injury in fact. Any difficulty in demonstrating causation in this case could only derive from the same issue of alternative political remedies already resolved under the injury in fact inquiry. *See Harrington v. Bush*, 180 U.S.App.D.C. 45, 553 F.2d 190 (D.C. Cir. 1977).

**24.** Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv.L.Rev. 1, 7–9 (1959).

**25.** *See, e. g.*, *Powell v. McCormack*, 395 U.S. 486, 518 21, 548 49, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

**26.** *See* L. Henkin, Foreign Affairs and the Constitution 210–16 (1972).

**27.** *Guaranty Trust Co. v. U. S.*, 304 U.S. 126, 137–38, 58 S.Ct. 785, 82 L.Ed. 1224 (1938); *Williams v. Suffolk Ins. Co.*, 38 U.S. (13 Pet.) 415, 420, 10 L.Ed. 226 (1839).

**28.** *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 307, 7 L.Ed. 415 (1829).

**29.** *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 96 L.Ed. 586 (1952).

**30.** 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962).

committed by the Constitution to the executive and legislative branches of the government and "the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."[31] This is the basis of the Supreme Court decisions in the foreign relations cases traditionally viewed as raising political questions. In none of these cases did the Court refuse to consider whether the President's action had exceeded his constitutional authority. Instead it concluded that the President's decision was within his authority and therefore binding on the courts.[32] In the area of foreign relations, as in any other area, a court generally should not dismiss a case as a political question if the Constitution does not entrust resolution of the issue to a coordinate political branch or if the challenged governmental action is *ultra vires. See Powell v. McCormack,* 395 U.S. 486, 519, 548–49, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *United States v. American Telephone & Telegraph Co.,* 185 U.S. App.D.C. 254, 258–261, 567 F.2d 121, 125–28 (D.C. Cir. 1977). Unless the case raises other concerns of a prudential or functional nature, a judicial resolution under those circumstances requires no more than an interpretation of the Constitution—a responsibility that beyond question lies with the courts.[33]

Defendants urge that the executive power over foreign affairs[34] represents such a constitutional commitment and that the President's action in giving notice of termination in accordance with the terms of the Mutual Defense Treaty is within this authority. The Constitution carefully delineates the roles played by the executive and legislative branches in treaty formation, stating that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties . . . ."[35] The Constitution is silent, however, on the question of treaty termination. Although defendants argue that the President's recognized constitutional responsibility for the conduct of foreign affairs and the implementation of treaties includes the power to terminate treaties, they acknowledge, as they must, that there is no express constitutional commitment of this power. Their argument that such a commitment can be implied[36] is unsatisfactory, for it is just as possible to imply the requirement of a legislative role in the termination process. Thus, the "textual commitment" formulation of the political question doctrine does not bar judicial resolution of plaintiffs' claim.

Defendants also contend that this case presents a political question principally because of the "unusual need for unquestioning adherence to a political decision already made," the "potentiality of embarrassment from multifarious pronouncements by various departments on one issue," and the "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion."[37] The Court finds that an interpretation of the Constitution

---

31. *Id.* at 211 n. 31, 82 S.Ct. at 707 n. 31, quoting *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918). *See also Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

32. Henkin, *Is There a Political Question Doctrine?,* 85 Yale L.J. 597, 612 (1976).

33. *See United States v. Nixon,* 418 U.S. 683, 703–05, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Powell v. McCormack,* 395 U.S. 486, 548–49, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

34. The President's powers over the conduct of foreign relations derive from a number of Constitutional provisions. U.S.Const., art. II, § 2 ("The President shall be Commander in Chief of the Army and Navy . . /."); *id.* ("He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties . . . ."); *id.,* art. II, § 3 ("[H]e shall receive Ambassadors and other public ministers; he shall take Care that the Laws be faithfully executed . . . .").

35. U.S.Const., art. II, § 2.

36. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

37. *See Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

with respect to the allocation of power between the political branches in the treaty termination process presents none of these prudential and functional concerns. Nor are any of the other formulations of a political question "inextricable from the case at bar." [38] In this case, the Court is not attempting to evaluate the wisdom of the underlying political decision or to substitute its judgment for that of a political department, but simply to determine whether the treaty termination was effectuated by constitutionally permissible means.

Many times in our history, courts have heard and resolved disputes concerning the allocation of power between the legislative and executive branches without raising the bar of the political question doctrine.[39] Rather than presenting a nonjusticiable political question, the procedure required by our Constitution to terminate the Mutual Defense Treaty must be decided on the merits. The Court is confronted with a dispute consisting of a clash of authority between the two political branches in a posture suitable for judicial resolution.

## III.

■ The prime question confronting the Court in this case is what governmental action is required by the Constitution to terminate the 1954 Mutual Defense Treaty with Taiwan. Because that treaty contains a termination clause stating that notice of termination may be given by either party, the narrower issue becomes whether the President of the United States is a "party" for purposes of this clause and thus able to take unilateral action with respect to the notice of termination.

Unlike its careful allocation of the power to enter into treaties, the Constitution contains no specific reference to the manner in which treaties are to be terminated. Nor is there any definitive evidence of the intentions of the Framers. No court has ever addressed the precise issue here presented of the President's authority to effect termination of a validly binding treaty, let alone a mutual defense treaty, without legislative participation.[40] A wide range of legal opinion has been presented by scholars and com-

**38.** *Id.* The Court finds distinguishable those decisions that held actions challenging the legality of military operations in Southeast Asia to be nonjusticiable. Because of various pieces of congressional legislation in support of such operations and the changing nature of the hostilities, those cases primarily involve the difficulty posed by the "lack of judicially discoverable and manageable standards." *Id.* Thus, the courts were not competent to resolve disputes over the specific form of legislative action required to constitute congressional approval, whether unilateral action by the President escalating the activities had exceeded the scope of congressional authorizations, or whether, if unauthorized, the President was nevertheless acting in good faith to terminate involvement in the war. *See, e. g., Mitchell v. Laird,* 159 U.S.App.D.C. 344, 347–349, 488 F.2d 611, 614–16 (D.C. Cir. 1973); *Holtzman v. Schlesinger,* 484 F.2d 1307 (2d Cir.1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *DaCosta v. Laird,* 471 F.2d 1146 (2d Cir.1973). Simply determining what the constitutionally required allocation of power between the two political branches is with respect to treaty termination, and that some mutual participation is required, involves no such problems.

**39.** *See, e. g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 519 (1976); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926); *United States v. American Tel. & Tel. Co.,* 185 U.S.App.D.C. 254, 258–259, 567 F.2d 121, 125–26 (D.C. Cir. 1977); *Senate Select Comm. on Presidential Campaign Activities v. Nixon,* 162 U.S.App.D.C. 183, 498 F.2d 725 (D.C. Cir. 1974).

**40.** In *Van Der Weyde v. Ocean Transport Co.,* 297 U.S. 114, 56 S.Ct. 392, 80 L.Ed. 515 (1935), the Supreme Court upheld the constitutionality of the President's delivery of a notice of termination of treaty provisions that were in conflict with the Seamen's Act of 1915, where such termination was specifically "requested and directed" by Congress in the Act. The Court found it unnecessary to pass on the question of "the authority of the Executive in the absence of Congressional action, or of action by the treaty-making power, to denounce a treaty of the United States . . . ." *Id.* at 117, 56 S.Ct. at 394.

The Court has also recognized the President's power to determine compliance and the continuing validity of a treaty. *See, e. g., Clark v. Allen,* 331 U.S. 503, 508–14, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947); *Charlton v. Kelly,* 229 U.S. 447, 474–76, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Terlinden v. Ames,* 184 U.S. 270, 285–88, 22 S.Ct. 484, 46 L.Ed. 534 (1902). That power,

mentators, who are unable to agree concerning which branch of the federal government has authority to represent the United States in treaty terminations.[41]

Since the first treaty to which the United States was a party was terminated in 1798 by an act of Congress,[42] a variety of means have been used to terminate treaties: by statute directing the President to deliver notice of termination; by the President acting pursuant to a joint resolution of Congress or otherwise acting with the concurrence of both houses of Congress; by the President acting with senatorial consent; and by the President acting alone.[43] The final method of termination is of particular relevance here, but the precedents involving unilateral executive action [44] are of only marginal utility. None of these examples involves a mutual defense treaty, nor any treaty whose national and international significance approaches that of the 1954 Mutual Defense Treaty.[45] Virtually all of them, moreover, can be readily distinguished on the basis of some triggering factor not present here.[46]

however, is sharply distinguishable from a power to act affirmatively to terminate a validity binding treaty—as here, in accordance with a treaty provision granting the United States the option to terminate. *See* note 46 *infra* and accompanying text.

**41.** *See, e. g.*, L. Henkin, Foreign Affairs and the Constitution 167–71 (1972); Scheffer, *The Law of Treaty Termination as Applied to United States De-Recognition of the Republic of China*, 19 Harv.Int'l L.J. 931 (1978); Nelson, *The Termination of Treaties and Executive Agreements by the United States: Theory and Practice*, 42 Minn.L.Rev. 879 (1958); Riesenfeld, *The Power of Congress and the President in International Relations: Three Recent Supreme Court Decisions*, 25 Calif.L.Rev. 643, 658–664 (1937); M. Reisman & M. McDougal, *Who Can Terminate Mutual Defense Treaties?*, The National Law Journal, May 21, 1979, at 19. *See generally Resolution Concerning Mutual Defense Treaties: Hearings on S. Res. 15 Before the Committee on Foreign Relations*, 96th Cong., 1st Sess. (1979).

**42.** The first treaties terminated by the United States were the treaties of 1778 between the United States and France, terminated by the Act of July 7, 1798, 1 Stat. 578. The validity of that congressional action was upheld in *Hooper v. United States*, 22 Ct.Cl. 408, 425 (1887).

**43.** *See generally Resolution Concerning Mutual Defense Treaties: Hearings on S. Res. 15 Before the Committee on Foreign Relations*, 96th Cong., 1st Sess. 157 (1979) ("History of Treaty Terminations by the United States," an appendix to a memorandum prepared by the Department of State Legal Advisor) [hereinafter cited as State Dept. Memorandum]; Emerson, *The Legislative Role in Treaty Abrogation*, 5 J.Legis. 46, 52–64 (1978); Scheffer, *supra* note 41, at 979–85, 993–95 (1978).

**44.** Of the more than fifty treaty terminations in our nation's history, defendants point to thirteen instances in which the President acted to terminate a treaty and his action was unaccompanied by specific senatorial or congressional approval. *See* Supplementary Memorandum in Support of Defendants' Opposition to Plaintiffs' Motion to Alter or Amend; State Dept. Memorandum, *supra* note 43. Not all of the cited examples constitute precedent for presidential termination, since in two cases the notice of termination was subsequently withdrawn by the President. *See* 1965 notice of termination of the Warsaw Convention, 49 Stat. 3000, T.S. No. 876; 1933 notice of termination of the Extradition Treaty with Greece, 47 Stat. 2185, T.S. No. 855. For a critical analysis of these precedents for unilateral presidential termination, see Scheffer, *supra* note 41, at 979–86.

**45.** Most of the terminations by the President alone involved commercial situations where the need for the treaty, or the efficacy of it, was no longer apparent.

**46.** Unilateral executive action in terminating a treaty would presumably be permissible, as both parties recognize, when the treaty is superseded by an inconsistent law or treaty; when the treaty becomes impossible to perform or is otherwise rendered inoperative; when the treaty is violated or denounced by the other party; or when there has been a fundamental change in circumstances affecting the treaty. In such cases, the President may determine that the continuing validity of the treaty has been destroyed, either because under principles of international law the United States could justifiably withdraw from the treaty or because the treaty is in conflict with more recent legislation. Scheffer, *supra* note 41, at 987–88; *see, e. g., Clark v. Allen*, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947); *Van Der Weyde v. Ocean Transport Co.*, 297 U.S. 114, 56 S.Ct. 392, 80 L.Ed. 515 (1935); *Charlton v. Kelly*, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Terlinden v. Ames*, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1902).

Many of the instances cited by defendants in which the President has acted alone involve one or more of the above factors. In others, if

The great majority of the historical precedents involve some form of mutual action, whereby the President's notice of termination receives the affirmative approval of the Senate or the entire Congress.[47] Taken as a whole, the historical precedents support rather than detract from the position that the power to terminate treaties is a power shared by the political branches of this government.

## A.

Defendants' argument that the President has authority to terminate unilaterally the Mutual Defense Treaty is premised on the executive power over foreign affairs. This authority derives from the enumerated Article II powers, including those that authorize the President to make treaties with the advice and consent of the Senate[48] and to receive representatives of foreign nations.[49]

Because the President has been termed "the sole organ of the federal government in the field of international relations,"[50] defendants argue that construing the Constitution to require that the Senate or the Congress also has a right to participate in treaty termination would be inconsistent with the President's constitutional authority over foreign affairs. They further urge that the Senate's role of advising and consenting in the making of treaties is not an independent source of legislative power, but only a limitation upon the treaty-making power of the President. Such limitations,

they conclude, must be strictly construed and not extended by implication. See Myers v. United States, 272 U.S. 52, 164, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

An attempt to justify a unilateral presidential power to terminate treaties by analogy to the Supreme Court's treatment of the removal power in Myers is unpersuasive. The power to remove executive personnel cannot be compared with the power to terminate an important international treaty. The removal power is restricted in its exercise to "purely executive officers" charged with a duty unrelated to the legislative or judicial power.[51] It concerns the President's administrative control over his subordinates and flows from the President's obligations to see that the laws are faithfully executed.[52] By contrast, treaty termination impacts upon the substantial role of Congress in foreign affairs—especially in the context of a mutual defense pact involving the potential exercise of congressional war powers—and is a contradiction rather than a corollary of the Executive's enforcement obligation. The same separation of powers principles that dictate presidential independence and control within the executive establishment preclude the President from exerting an overriding influence in the sphere of constitutional powers that is shared with the legislative branch. A power to terminate treaties that are made "by and with the Advice and Consent of the

the treaty was not actually superseded by inconsistent legislation, there was at the very least a substantial participation by Congress in establishing the policy that led to the termination, the result of which amounted to an implied authorization. E. g., 1933 termination of the Multilateral Convention for the Abolition of Import and Export Prohibitions and Restrictions of 1927, 46 Stat. 2461, T.S. No. 811. In those few remaining instances in which the presidential termination cannot otherwise be justified, the treaty had already become generally ineffectual or the matter involved was relatively insignificant. E. g., 1944 Termination of the Inter-American Convention for Trademark and Commercial Protection of 1929, 46 Stat. 2907, T.S. No. 833; 1927 termination of the Convention with Mexico on the Prevention of Smuggling, 44 Stat. 2358, T.S. No. 178.

47. See notes 66–70 infra and accompanying text. See generally authorities cited at note 43 supra.

48. U.S.Const. art. II, § 2.

49. Id. § 3.

50. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936).

51. Humphrey's Executor v. United States, 295 U.S. 602, 631–32, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); see Wiener v. United States, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958).

52. Myers v. United States, 272 U.S. 52, 135, 163–64, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

Senate"[53] simply does not fall within the limited scope of the *Myers* rationale.

Nor, for reasons more fully set forth below, can the President's status as the nation's spokesman and representative in foreign affairs serve as the basis for exclusive executive power over the entire process of treaty termination. While the President may be the sole organ of communication with foreign governments, he is clearly not the sole maker of foreign policy. In short, the conduct of foreign relations is not a plenary executive power.[54]

Defendants also suggest that the recognition power of the President[55] is directly implicated in the present situation because termination of the 1954 Mutual Defense Treaty was generally viewed as a prerequisite to normalization of relations between the United States and the People's Republic of China.[56] As a result, defendants urge that the President's notice of termination is supported by his exclusive "[p]ower to remove . . . obstacles to . . . recognition," a power that has been acknowledged by the Supreme Court. *United States v. Pink*, 315 U.S. 203, 229, 62 S.Ct. 552, 565, 86 L.Ed. 796 (1942); *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1934).

The *Pink* and *Belmont* cases both involved the propriety of the Litvinov Assignment, an international executive agreement providing that Soviet claims to Russian assets in the United States would be assigned to the United States government and used to settle American claims resulting from Soviet nationalization decrees. Settlement of these claims had become a condition precedent to the establishment of diplomatic relations with the Soviet government. The Supreme Court held that this agreement was valid and superseded New York state laws and policy against confiscation of private property.

Defendants rely on the following statement of Justice Douglas, writing for the Court in *Pink*:

> Power to remove such obstacles to full recognition as settlement of claims of our nationals . . . certainly is a *modest implied power of the President* who is the "sole organ of the federal government in the field of international relations." . . . Unless such a power exists, the power of recognition might be thwarted or seriously diluted.

315 U.S. at 229–30, 62 S.Ct. at 565 (citations omitted) (emphasis added).

Defendants' argument lacks merit. The power to terminate a Mutual Defense Treaty cannot similarly be described as a "modest implied power of the President." A holding that the recognition power incidentally confers the power to make an executive agreement settling property claims and that such agreement has supremacy over conflicting state law does not justify an incidental power to terminate treaties without congressional approval. The argument that any executive action becomes constitutional if it is ancillary to an act of recognition is without merit. If limitations imposed by other constitutional provisions exist, the recognition power cannot be used as a "bootstrap" to support the President's

---

**53.** U.S.Const. art. II, § 2.

**54.** As Justice Jackson, in referring to Article II, § 1 of the Constitution, stated in his concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 641, 72 S.Ct. 863, 873, 96 L.Ed. 1153 (1952): "I cannot accept that this clause is a grant in bulk of all conceivable executive power but regard it as an allocation to the presidential office of the generic powers thereafter stated."

**55.** The President's power to recognize a government as the representative of a foreign state—in this case recognizing the People's Republic of China as the sole government of China—is not challenged. *See, e. g., United States*

*v. Pink*, 315 U.S. 203, 229, 62 S.Ct. 552, 86 L.Ed. 796; *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137–38, 58 S.Ct. 785, 82 L.Ed. 1224 (1937). The recognition power flows from his express authority under U.S.Const. art. II, § 3, to "receive Ambassadors and other public ministers."

**56.** *See, e. g.*, Declaration of Warren Christopher, Deputy Secretary of State, in support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, ¶¶ 4, 7. Steps toward normalization were taken with the exchange of ambassadors on March 1, 1979.

unilateral action in terminating the Mutual Defense Treaty with Taiwan.

### B.

The termination of a treaty is not a single act entrusted by the Constitution to one or the other of our political branches. Like treaty formation, treaty termination is comprised of a series of acts that seek to maintain a constitutional balance. Initially, a policy determination must be made concerning whether the treaty should be terminated and the appropriate negotiations to effect termination undertaken. Such actions are clearly within the competency of the executive branch. Similarly, the communication of the message terminating a treaty, as here by delivery of formal notice to the other party pursuant to the terms of the agreement, is committed to the President as the sole representative of our country in foreign affairs.[57]

But these purely executive functions are not the only elements involved in treaty termination. Termination of a treaty also involves a repeal of the "law of the land" established by the agreement. It is in this area that congressional participation is required under the present circumstances. The mere fact that the President has the authority to make an initial policy determination regarding the exercise of an option to terminate, and to notify the foreign state of termination, does not vest him with the unilateral power to complete the termination process and thereby effect the abrogation of the treaty. As two scholars have

recently noted, "[i]t is inherently inconceivable that . . . a constitutional policy requiring joint action for external agreement and internal legislation could allow that agreement and law to be terminated by the president alone, against the intentions of the legislature."[58]

This conclusion is dictated by several constitutional factors: the status of treaties as the supreme law of the land, together with the obligation of the President to faithfully execute those laws; the implications to be derived from the constitutionally delineated role of the Senate in treaty formation; and the fundamental doctrine of separation of powers. It is further bolstered by the historical experience represented by constitutional interpretation and practice.

> Article VI of the Constitution provides: This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land . . . .

U.S.Const. art. VI, cl. 2. Defendants argue, however, that the 1954 Mutual Defense Treaty is not a "law of the land" for supremacy clause purposes. They assert that only those treaties that are self-executing, and thus become effective as domestic law at the time the agreement goes into effect, constitute the supreme law of the land.[59] Careful consideration of the provisions of the Mutual Defense Treaty establishes that a number of its provisions are self-executing[60] and that still others have been imple-

---

**57.** *See* Restatement (Second) of the Foreign Relations Law of the United States § 163(a)(1) (1965).

**58.** M. Reisman & M. McDougal, *supra* note 41, at 19, col. 4.

**59.** The distinction between self-executing and non self-executing treaties was first expressed by Chief Justice Marshall in *Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 7 L.Ed. 415 (1829): "Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, wherever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract—when either of the parties engages to

perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract, before it can become a rule for the court." *Id.* at 314. *See generally* L. Henkin, Foreign Affairs and the Constitution, 156–61 (1972); Restatement (Second) of the Foreign Relations Law of the United States § 141 (1965).

**60.** The Treaty's key provision—Article V, which declares that each party would act to meet the common danger of an armed attack in the West Pacific area "in accordance with its constitutional processes"—is self-executing. Under the "constitutional processes" of the United States, the President has authority to

mented by subsequent legislation.[61] In light of the terms and conditions of the Treaty, as well as the acts subsequently taken by the Congress and the President which have fixed and defined the nation's responsibilities under it, it is now far too late to assert that this Treaty fails to have the status of the supreme law of the land under Article VI. Moreover, none of the factors that would impair that status are involved here.[62]

Article II, section three of the Constitution requires that the President "shall take care that the Laws be faithfully executed." This constitutional responsibility clearly extends to all laws of the land, including in this instance the Mutual Defense Treaty. The President cannot faithfully execute that treaty by abrogating it any more than he can faithfully execute by failing to administer. He alone cannot effect the repeal of a law of the land which was formed by joint action of the executive and legislative branches, whether that law be a statute or a treaty. The limits upon his authority are in no way altered by the inclusion of a termination provision in Article X of the Mutual Defense Treaty, allowing either party to terminate upon one year notice. The President's powers of administering the Treaty do not include the power to terminate in accordance with the provisions of Article X. The "party" to which the termination provision refers is the United States, not the President alone, and such termination can only be effectuated in accordance with United States constitutional processes.

The requirements imposed by the Supremacy Clause and the President's responsibility to faithfully execute the laws are further supported by the doctrine of separation of powers and its corollary concept of checks and balances, which lies at the heart of our constitutional system. In the treaty formation process, the Constitution expressly limits the Executive's role by requiring the advice and consent of two-thirds of the Senate.[63] This constitutional requirement reflects the concern of the Founding Fathers that neither political branch possess unchecked power.[64]

A judicial determination that the President enjoys unilateral authority to terminate treaties would raise the same fears and present the same possibility of abuse. It would be incompatible with our system of checks and balances if the executive power in the area of foreign affairs were construed to encompass a unilateral power to terminate treaties. It is undisputed that the President is without power to amend the terms of a treaty. Any such amendment must be submitted to the Senate for its advice and consent.[65] If the lesser power to amend treaties is denied the President,

take certain action, short of a declaration of war by Congress, to alleviate the threat of armed attack. Thus the provision does not require the aid of implementing legislation in order to be operative. The mere fact that a congressional power exists does not mean that the power is exclusive so as to preclude the making of a self-executing treaty within the area of that power. Restatement (Second) of the Foreign Relations Law of the United States § 141 comment f (1965).

61. For instance, Article VII, which provides for the location of United States forces in and about Taiwan, is not self-executing at least to the extent that it requires appropriations by Congress, but such appropriations have been made. This non self-executing provision has thus been legislatively implemented.

62. *See* note 46 *supra* and accompanying text. The termination here is based solely upon the invocation of the termination provision in Article X of the Mutual Defense Treaty, rather than

upon a determination that the Treaty is no longer validly binding.

63. Article II, § 2 provides: "[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . ."

64. Alexander Hamilton, in discussing the treaty-making power, stated: "The history of human conduct does not warrant that exalted opinion of human virtue which would make it wise in a nation to commit interests of so delicate and momentous a kind as those which concern its intercourse with the rest of the world to the sole disposal of a magistrate, created and circumstanced, as would be a president of the United States." Federalist No. 75, pp. 505–06 (J. Cooke ed. 1961).

65. *See The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 75, 5 L.Ed. 191 (1821); Restatement (Second)

*a fortiori*, the greater power to annul should also be denied. In the present situation the President may very well be carrying out the wishes of the American people but because the legislative branch has not participated in the treaty termination process, there is no way to ascertain this fact. As Justice Frankfurter stated in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594, 72 S.Ct. 863, 889, 96 L.Ed. 1153 (1952): "The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority."

The predominate United States' practice in terminating treaties, including those containing notice provisions, has involved mutual action by the executive and legislative branches.[66] In most instances, the President's notice of termination has received the affirmative approval of either the Senate or the entire Congress. Although no one constitutional interpretation has been accepted, nor has a definitive procedure emerged, the weight of historical precedent clearly supports the view that some form of congressional concurrence is required. Support can be found for requiring either of two alternatives: 1) the approval of a majority of both houses of Congress,[67] or 2) the consent of two-thirds of the Senate.[68] The latter is of course the most analogous to the treaty-making power,[69] while the former is

of the Foreign Relations Law of the United States § 163(2) (1965).

66. At the Court's request counsel supplied information as to the number of treaties terminated and whether the terminations were effected by joint action or unilaterally. Different totals were submitted. Further study of these terminations indicates that in most of them there was some congressional action which was consistent with the position of the Executive.

67. The passage of a joint resolution specifically authorizing or directing the President to give notice of termination has been a relatively common method employed by Congress in exercising its role in the treaty termination process. Two examples involving express presidential requests for such authority are particularly instructive. The termination of the 1827 Convention with Great Britain for the Joint Occupation of the Oregon Territory—the first termination pursuant to a notice provision in a treaty—was effected in 1846 following the enactment of a joint resolution authorizing President Polk to give the notice of termination. H. J. Res. of April 27, 1846, 9 Stat. 109. The 1832 Treaty of Commerce and Navigation with Russia terminated when President Taft's delivery of the notice of termination—again pursuant to treaty provision—was subsequently approved by joint resolution, H. J. Res. of December 21, 1911, 37 Stat. 627, following the President's message to the Senate of his intent to terminate "with a view to its ratification and approval," 48 Cong. Rec. 454 (1911). In other instances, joint resolutions directing or authorizing the termination of treaties pursuant to notice provisions have been passed without any prior presidential initiative. J. Res. of Feb. 26, 1883, 22 Stat. 641 (Amity Treaty of 1871 with Great Britain); J. Res. of June 17, 1874, 18 Stat. 287 (Treaty of Commerce and Navigation of 1858 with Belgium); J. Res. of Jan. 8, 1865, 13 Stat. 566 (Reciprocity Treaty as to Fisheries, Commerce, and Navigation of 1854 with Great Britain). In addition, Congress has enacted statutes which conflict with earlier treaties and which specifically request the President to terminate inconsistent treaties. Fishery and Conservation Management Act of 1976, Pub.L.No.94–265, Title II, § 202(b), 90 Stat. 340; Seamen's Act of 1915, Pub.L.No.63–302, § 16, 38 Stat. 1184. *See also* Trade Agreements Extension Act of 1951, Pub.L.No.82–50, § 5, 65 Stat. 72.

68. At least two treaties have been terminated pursuant to Senate approval without any participation by the House of Representatives. Pursuant to notice of termination delivered by President Buchanan, the 1826 Convention of Friendship, Commerce, and Navigation with Denmark was terminated following a unanimous Senate resolution. S. Res. of March 3, 1855, 33d Cong., 2d Sess. In connection with that termination, the Senate Foreign Relations Committee issued a report in April, 1856, which concluded that the treaty-making power—the Senate and the President acting together—could terminate a treaty without participation by the House of Representatives. S.Rep. No.97, 34th Cong., 1st Sess. (1856). A second instance was the termination of the International Sanitary Convention of 1903 following a two-thirds vote of approval by the Senate as requested by President Wilson. S. Res. of May 26, 1921, 61 Cong.Rec. 1793.

69. Several commentators have argued the constitutional soundness of terminating treaties in accordance with the same power that concludes those treaties. *E. g.*, Scheffer, *supra* note 41, at 1002–03; Riesenfeld, *supra* note 41

based primarily on congressional authority to repeal a law of the land.[70]

When faced with an apparent gap in the Constitutional allocation of powers, the Court must refer to the fundamental design of the entire document and determine how its purposes would be best served in the gap area. The Court believes that either of these two alternative procedures for congressional participation is a constitutionally sound means of terminating treaties. The important point is that treaty termination generally is a shared power, which cannot be exercised by the President acting alone. Neither the executive nor legislative branch has exclusive power to terminate treaties. At least under the circumstances of this case—involving a significant mutual defense treaty with a faithful ally, who has not violated the terms of the agreement, and the validity of which has not otherwise been destroyed—any decision of the United States to terminate that treaty must be made with the advice and consent of the Senate or the approval of both houses of Congress. That decision cannot be made by the President alone.

In view of the foregoing, it is the declaration of this Court that the President's notice of termination must receive the approval of two-thirds of the United States Senate or a majority of both houses of Congress for it to be effective under our Constitution to terminate the Mutual Defense Treaty of 1954.[71] It is further ordered that the Secretary of State and his subordinate officers are hereby enjoined from taking any action to implement the President's notice of termination unless and until that notice is so approved.

at 660–61. There is also some eminent dictum to support that approach: in *Techt v. Hughes*, 229 N.Y. 222, 243, 128 N.E. 185, 192, *cert. denied*, 254 U.S. 643, 41 S.Ct. 14, 65 L.Ed. 454 (1920), Judge Cardozo stated: "[The] President and senate may denounce the treaty, and thus terminate its life."

**70.** The Supreme Court's decision in *Van Der Weyde v. Ocean Transport Co.*, 297 U.S. 114, 56 S.Ct. 392, 80 L.Ed. 515 (1935), would appear to be the strongest judicial authority for participation by the entire Congress in the treaty termination process. *See* note 40 *supra*. Requiring such participation is supported by the fact that a treaty, like a statute, constitutes the supreme law of the land whose repeal is the proper subject of congressional authority. In that regard, it is undisputed that a subsequent act of Congress which is clearly inconsistent with a treaty supersedes that treaty as domestic law to the extent of the conflict. *Chae Chan Ping v. United States*, 130 U.S. 581, 599–601, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); *Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888); *Head Money Cases*, 112 U.S. 580, 597–99, 5 S.Ct. 247, 28 L.Ed. 798 (1884); *Diggs v. Shultz*, 152 U.S.App.D.C. 313, 318, 470 F.2d 461, 466 (D.C. Cir. 1972). *See also Reid v. Covert*, 354 U.S. 1, 18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

**71.** As previously indicated, nothing contained in the Taiwan Relations Act, Pub.L.No.96–8, 93 Stat. 14, can be construed as legislative approval of or acquiescence in the President's notice of termination. *See* note 18 *supra*.